# CHARLESTON.

YOUNG *et al.* v. IMPROVEMENT LOAN AND BUILDING ASSOCIATION, *et al.*

### Decided December 15, 1900.

1. BUILDING ASSOCIATION—*Insolvency.*

   When a building association becomes insolvent and unable to go on with its business, and its affairs must be wound up, the debts of a borrowing member are at once collectable, though not yet payable by their terms; and the obligation of members to pay dues on stock ceases, as the loan contract is abrogated by the insolvency, so far as the contract remains unexecuted. (p. 519).

2. Borrowing Member—*Rights and Liabilities.*

A borrowing member of a building association, assigning his stock to it as collateral security for his loan, and agreeing to pay periodical dues on his stock, still continues a member of the association. (p. 520).

3. Insolvent Association—*Debts of Members.*

Upon the insolvency of a building association the dues paid on stock by borrowing members are not to be credited on the debts of such members. (p. 522).

4. Borrowing Member—*Present Relief.*

Upon insolvency of a building association, in winding up its affairs a borrowing member must be charged with his debt and interest, and credited with all moneys paid in by him except dues on stock. After payment of debts he gets his share of residue, in the final distribution of what remains after payment of expenses of winding up and debts. If it be safe to all interests and practicable to ascertain the present value of the stock, the court may, for the present relief of a borrowing member, credit that value of his stock on his indebtedness, without deferring its application till the final wind-up. (pp. 523, 524).

5. Deed of Assignment—*Presumption.*

A deed of assignment by an insolvent corporation for the benefit of creditors and stockholders is presumed to have been made by the authority of its stockholders, until it is shown to be without such authority. (p. 531).

6. Assignment for Benefit of Creditors—*Barred by Laches.*

Where an assignment by an insolvent building association of its assets for the benefit of creditors and members is made by order of the directors, without authority of stockholders, is acquiesced in for a considerable time, or acted under by positive acts of stockholders, and its impeachment would disturb the state of things arising under the assignment, such stockholders will be barred by *laches* and acquiescence from contesting the validity of the assignment to the prejudice of other parties. (p. 531).

7. Contract of Loan—*How Construed.*

The statute relating to a building association, and its by-laws, so far as they touch its loans, are a part of the contract of loan made by it; and wherein the contract of loan violates such statute or by-laws it is void, and the contract is construed according to the statute or by-laws, and so enforced, as every borrowing member is charged with the knowledge of the same. (p. 533).

Appeal from Circuit Court, Berkeley County.

Bill by Charles A. Young and another against the improve-

ment Loan and Building Association and others. Decree for complaints, and defendants, the Kilbourne Knitting-Machine Company and others appeal.

*Affirmed.*

FAULKNER, WALKER & WOODS and H. H. EMMERT, for appellants.

FLICK, WESTENHAVER & NOLL and A. C. NADENBOUSCH, for appellee.

BRANNON, JUDGE:

The Improvement Loan and Building Association of Martinsburg is a West Virginia corporation. It made one contract with the Middlesex Knitting Company by which it sold to said knitting company a lot of land in Martinsburg at the price of ten thousand dollars, and also advanced said knitting company twenty-five thousand dollars, making thirty-five thousand dollars indebtedness, for which the knitting company gave to the building association seventy notes, fifty bearing six per cent. interest, and twenty, those representing the ten thousand dollars purchase money for the land, bearing five per cent. interest; all said notes were to be paid as follows: The knitting company agreed to subscribe for shares of stock in the usual manner and form transacted by the building association, and pay weekly installments of dues till the sum of eighty-eight dollars a share should be paid thereon, and when such payments should be completed the shares of stock were to be assigned by the knitting company to the building association issuing them, which were to be cancelled, and thus operate in full payment of the said seventy notes. It was provided that if the knitting company failed to pay dues and interest, the notes might be treated by the association as matured; but "in that event the withdrawal value of the shares shall be credited on the notes." The contract provided that the shares of stock in the building association should be assigned by the knitting company to said association as collateral security for the said seventy notes. The said building association afterwards made a further loan to the said knitting company on like terms. The said building association also made a loan of twenty-five thousand dollars to the Kilbourne Knitting Machine Company upon like stipulations with those above given. Afterwards, owing to unfortunate loans made by the building association, before the notes of the said two knitting companies,

and also before said stock in the building association matured, the said building association became insolvent and executed a deed assigning all its assets to Adrain C. Nadenbousch and C. A. Young as trustees for the payment first of costs of executing the trust; next, to pay debts of the association; next, to pay the residue to the stockholders of the association as their interest might be legally established.

The trustees filed their bill in the circuit court of Berkeley County against the building association, its stockholders and said two knitting companies setting up the many matters involved in these important transactions, alleging complications in the administration of their trust and their inability to execute it without the aid and guidance of a court of equity, and praying that the court might adjudicate the various matters involved in the administration of the trust under said assignment, and give said trustees aid and guidance in the administration of the trust. The case was before a special commissioner in chancery several times. The court rendered several decrees in the case. The said knitting companies being dissatisfied, presented a petition to the circuit court for a re-hearing, assigning various errors in the decrees; but, except as to the two matters, the court held its decree right and refused relief as asked by the petition for re-hearing. Later, the said knitting companies filed an answer and took some testimony to sustain their answer; but the court being of opinion that the matters put in issue by the answer had already been adjudged in former decrees, declined to pass on the matters set up in the answer. From all the decrees in the case the said Kilbourne Knitting Machine Company and the Middlesex Knitting Company took this appeal.

The vital controversy in this case may be stated thus: The building association, in the purpose designed in its incorporation, contemplated that subscribers to its stock should through a series of years pay periodical dues until such time as, by means of such dues, and interest on loans by the association to its members, its shares should reach par value, and that those of its members borrowing money from it should, by the surrender to it of their shares of stock, cancel and pay their notes for money lent. The contracts of loan to the two knitting companies in this case did not provide for the payment of dues until their stock should reach par, let that be when it might, but provided that when by such dues the two knitting companies should have

paid eighty-eight dollars per share, then the stock should be surrendered and the debts of the two knitting companies to the building association should be cancelled. The general plan of the association was frustrated by the insolvency of the company, owing to its losses. Long before the debts of the knitting companies had matured and said companies had by payment of dues paid the eighty-eight dollars per share of their stock, as provided in the contracts, insolvency befell the building association. The said knitting companies had paid considerable money in dues on their stock. They paid some dues after the deed of assignment. Those companies contend that they are entitled to a specific performance of their contracts with the building association; that notwithstanding the disaster of total insolvency, which fell upon the building association, they are entitled, under said contracts, to go on paying the weekly dues until they shall pay eighty-eight dollars per share on their stock and then have their indebtedness cancelled; or, if this cannot be allowed, that the said knitting companies must be allowed credit on their indebtedness, on their notes, for all moneys paid by them by way of dues on their stock, and that said dues must not be applied to their stock, thus depriving them of the right claimed by them to have the moneys paid as dues credited on their said notes of indebtedness. They thus deny the right of the trustees, in the interest of the general creditors and non-borrowing stockholders of the building assocation, to collect from said knitting companies at once, and before maturity of the loan notes of the knitting companies, the said loan notes; and they deny the right of said trustees to apply the moneys paid by them as dues only on their stock liability, and claim that it shall go, at the several dates of payment, as creditors on their loan indebtedness. Is either of these positions taken by the knitting companies sound? First as to the claim that the contracts must be kept alive and specifically performed, must go on until weekly payments under them shall make up eighty-eight dollars per share of stock, and then the stock, by surrender thereof, cancel the debts. Insolvency defeated the whole scheme and plan of the building association. That plan contemplated the issuance of stock and the loaning of its money to its members by way of advances to be repaid by way of interest and dues on stock through a number of years, until by means of such dues on stock and interest on loans and profits of investments, etc., the

stock should come to par. This contemplated a continuance of
business through years. But how could business be continued
when insolvency and failure ensued? A contract, such as those
between the building association and the knitting companies,
contemplated years of continued unbroken business by the build-
ing association 'for its performance; all parties to those contracts
had no other idea; but the misfortune of insolvency defeated the
whole project of those contracts, not merely the project and
design of the building association, but also of the knitting com-
panies. That contract has become impossible of performance.
Equity does not compel a party to perform what is impossible.
All the authorities say that when insolvency comes to a building
association, based on the scheme common to all our building
associations, such insolvency stops the wheels of its business
and cancels contracts of loan so far as unexecuted, that is, so
far as concerns the obligations of stockholders to pay periodical
dues on stocks, and so far as the contracts provide that the
association shall wait for the re-payment of its loans until the
stock shall mature to par value in process of years from periodi-
cal payment of dues. This is a necessary result of insolvency.
Why keep the company running when there are no assets with
which to run; or rather how can the association continue to run
without assets? How can creditors be paid? The authorities
are unanimous almost in holding that when insolvency comes
to a building association, the only thing possible is to wind up
its business and administer its assets for the benefit of creditors
and stockholders. The stockholders are released from the fur-
ther payment of dues, because the whole purpose of their en-
gagement to pay such dues on stock has failed, the consideration
of expected profits has failed. Those members who have bor-
rowed the money must pay their debts at once, because those
debts are assets of the association for the purpose of paying out-
side creditors, and giving to non-borrowing stockholders their
rights. Therefore, specific execution of these contracts is
utterly impracticable. "All authorities agree that on the pres-
ent abandonment of the enterprise, from whatever cause, the
original contract between the association and the borrower can-
not be carried out, and that neither party is therefore bound to
a literal fulfillment. There are three different views as to the
relative rights and obligations of the advanced and unadvanced
members, it being settled according to all theories that the

former cannot be assessed to equalize the value of shares, but that the assets are to be distributed as they stand." 4 Am. & Eng. Encyl. L. (2 Ed.) 1081; *Leahy* v. *Building Association,* 5 Am. & Eng. Decisions in Eq. 206, and note on page 254.

It results from the above position that insolvency cancels the contracts so far as they remain executory, that the debts due from the borrowing members must be at once called in to pay creditors and wind up the business, though those debts have not yet become payable. Thomp. on Corp. Vol. 7, s. 8796, says: "The effect upon borrowing members of a premature dissolution, or what practically amounts to the same thing, requires some notice. In return for the undertakings of the borrower in the transaction of loan or advancement, as they have been pointed out, there is an implied undertaking on the part of the association that the borrower shall have the advantage of the building association scheme in the liquidation of the whole of his indebtedness; *i. e.,* that it shall be by means of gradual payment, and that he shall participate, and have the opportunity of reducing his liability by his participation, in the profits of a continuing business to be carried on to a fixed end. Where, through bad management, financial misfortunes, loss of membership, or any other cause, the career of the association is brought to a premature close, the borrower is compellable forthwith to pay the balance due from him on his security, although in terms only given for installments. He is, therefore, deprived of some proportion of the advantages, the prospect of which induced him to assume the burden of his original obligation. There remains nothing to compensate him for his liability to make up the premiums, to keep up stock payments, to pay fines, etc. The consideration of the liability failing, the liability itself must, in a proportionate degree, fail also. In other words, there remains, on the one side a claim, on the other a liability, to be measured by the amount of money actually advanced. In such cases all the borrowers can be held for, (on the theory of a recission of at least part of his contract and remitting the parties, as to the rest, to the position of the ordinary lender and borrower) is the amount received by him from the association with legal interest." Volume 4, page 1082, Am. & Eng. Ency. L. (2 Ed.) says, "In any case, the borrower is necessarily compelled to pay up at once." "Mortgages given to secure loans (are) due and enforceable at once, without regard to their terms, even

though payable in installments, and the receiver can proceed to collect them." *Curtis* v. *Granite State Provident Ass'n.*, 69 Conn. 6; *Weir* v. *Granite, Etc., Ass'n.*, 56 N. J. Eq. 234; *Moran* v. *Gray*, (N. J.) 38 Atl. Rep. 668; *Irwin* v. *Granite State Provident Ass'n.*, 56 N. J. Eq. 244; *Strohen* v. *Franklin Savings Fund and Loan Ass'n.*, 115 Pa. 273." *Williams* v. *Maxwell*, 5 Am. & Eng. Dec. in Equity 278-9. Thomp. on Building Associations 396, says, "Upon dissolution such members may be compelled to pay the balance due from them on their securities, although the latter are given in terms only for the payment of installments."

Another question. Seeing that upon insolvency of a building association, it must be wound up, and to that end that its borrowing members, though their debts are not yet payable, must pay up at once, the question is one of account between them and the association. How shall they be charged? I answer, with debt and interest. Endl. Build. Asso. ss. 531, 528. With what shall they be credited? I answer, with payments made expressly on such indebtedness, and with fines and premiums, but not with periodical dues paid on stock. Endl. Build. Asso. s. 477.

The Middlesex Knitting Company and the Kilbourne Knittining Machine Company contend that when they gave their notes and entered into the contracts, with provision for periodical payments on an amount certain and fixed to be applied in liquidation of the principal sum until such weekly payments amounted to the principal sum, as provided in the contract, and adopted the by-laws as to penalties, in case of default, they can in no event be held as members of the association. So the brief of their counsel puts the proposition, and they say "the reason is apparent, the test simple: suppose the association had gone on to a final and successful conclusion, will it be contended that the appellants, under these contracts, could have demanded and received a share in the profits? The proposition is preposterous. Then if the appellants could not have, in that event, under these contracts participated in the profits, by what process of reasoning can they be held liable for losses?" So the brief of counsel propounds their proposition.

I think the result they would deduce from the premise is a *non sequitur,* even on that premise; but that premise does not exist in this case, because the association did not go on to success, and whatever would be the rights of a borrowing stock-

holder in case of success at the end, we are only called on to say what are his rights in case of failure before the end. We have in hand a case where there can be no profit, but only loss, to all stockholders. We must go on that basis. We must first collect assets before we know the loss, and in doing so we must know that there is only loss, and that some stockholders are borrowers from the association and that others are not, and we must do equity between them, so that each shall bear his fraction of the loss. But if I answer the question propounded by counsel, I. would say that in case of a successful association, if at its close there should be a surplus of profit, the borrowing member, after cancelling his indebtedness by the par value of his stock, would share in the surplus profits along with the non-borrowing member. Who else would get the surplus but the stockholders? But that is immaterial, in my view.

Counsel for the knitting companies say, as above stated, that when those companies made the contracts of loan and assigned their stock for security for the debt, and the contract gave them power to pay dues on stock up to a certain amount, and thereby cancel their indebtedness, they were not members in future and cannot be held to be still paying dues on stock, that such payments are not to be credited on stock, as would be the case of non-borrowing members, but all payments of dues must go on their indebtedness. The proposition that they ceased to be members is not sound in law. They still continued members of the association. Thomp. Corp. Vol. 7, ss. 8772, 8773, where it is stated that only Virginia and the District of Columbia have held that the relation of stockholder ceases under the circumstances stated above. See same work, page 332, saying, "The member as a borrower is still a member with all his rights, except as pledged. He may vote, hold office, transfer his shares subject to the lien, and do everything another shareholder may do." *Lister* v. *Log Cabin Association*, 38 Md. 115, holds the same doctrine. So. Endl. Build. Asso. s. 123. See 5 Am. & Eng. Dec. in Equity 234.

To sustain the proposition that when these borrowing members gave their bond for the advance of money and assigned their stock as collateral, they ceased to be members and were absolved from all obligation to sustain any share of losses, we are cited in Endlish on Building Associations, s. 81, reading thus: "The liability to contribute to expenses ceases with the cessation

of membership *bona fide,* and with the consent of the associa-
tion. If, upon becoming a borrower, the member relinquish his
membership; or, if, being an investor merely, he avails himself
of a provision in the rules or by-laws of the association, or of the
statute supreme over it, to withdraw himself from it, he cannot
subsequently be made liable for its debts and losses, and called
upon by the society to contribute towards their payment."
Clearly so. If he relinquishes his membership, or withdraws,
he is no longer a member; but merely borrowing, giving bond
and pledging stock as collateral do not lose him the benefits, or
release him from the obligations, of membership. The cases
cited by Endlich when examined do not antagonize this posi-
tion. One of them is *Bowker* v. *Mill River Loan Association,*
7 Allen 100. The question there was not a question of liability
for loss. That case only held that such a member was to be
regarded as a debtor, and could not maintain a bill in equity to
interfere with the management of the business of the associa-
tion. It was not a question of his liability upon the insolvency
of the association. The other case is the English case *Re West
Riding Society,* 45 Ch. D. 463, holding that by force of the by-
laws of the association when a member has paid up and dis-
charged all his obligations he ceased, by force of the by-laws, to
be a member or subject to any further liability. This must be
so, of course. His payment, under the very by-laws, ended
his relation as a member. We are also referred to Endlich,
Build. Assoc., s. 122. After speaking of Virginia decisions,
which are not the general law, holding that when a member
assigns his shares of stock as security for the loan, it is not a
pledge, but a total surrender of the stock to the company, and
the member is no longer such so as to share in the profits, End-
lich says: "And yet there is only one form which the contract
between a building association and the borrowing member may
assume, under which the latter can, by any practicable method,
be debarred from participation in the profits of the society, and
that is one which has none of the features of the building asso-
ciation scheme about it, save that of gradual repayment. It is,
where a member, obtaining an advance, surrenders his member-
ship, and gives his bond for the periodical repayment of a cer-
tain amount, to be applied in liquidation of the principal sum,
until such monthly payments themselves, in the aggregate, shall
amount to the principal sum; and adopting, as a part of his con-

tract, the regulations of the by-laws of the society as to penalties for neglect, etc. Under such an arrangement, it is clear, the borrower no longer has any interest in the society." That is where he surrenders his membership; but he does not do so by merely giving bond and hypothecating his stock. This is shown by Endlich in the same section in immediate connection proceeding to say: "But upon any other plan, the borrower, undertaking to continue his payment until, having gone into the general fund, they, with the other contributors, have swelled it to a certain magnitude, disunctly retains his interest in, his right to benefit by, his privileges to·participate in, the profits derived from all the various sources." Therefore, I do not see how Endlich supports the claim of counsel for the appellants. If they are yet participants in the profits, they must carry the corresponding burden of sharing in disaster.

Being still a member after such borrowing, the party occupies the two-fold character of debtor and stockholder, and his payments on debt are payments on debt, and his payments on stock are payments on stock—so intended in both cases. When insolvency comes he is still a member of this association organized as well for his benefit as that of other members, and other members not borrowing are entitled to call upon him to still occupy the status of a member and help bear the burden of disaster. He has no right to apply his stock payments on his indebtedness. When insolvency comes the original plan of the association is defeated. Such operations as were contemplated by all members, borrowers and non-borrowers, are unavoidably frustrated, they cannot be accomplished. The association cannot demand further payments on stock, because its business being stopped, it cannot apply such payments to effect the design for which they were stipulated to be made, and the consideration for their payment has ceased. Close up the affairs of the association is the only alternative. To do this, outstanding debts must be paid, chiefly from debts due from members, though not yet mature, because the association owns these debts as material assets and indispensable to pay outstanding debts, and then to be divided among stockholders. The member who is a borrower, as such occupies the position of a borrower—the relation between the association and him makes him its debtor for the money advanced to him, and he must pay it at once to enable the association to do the only thing it can do, wind up. Out of

the assets, including this indebtedness of this stockholder, a division is made, after payment of debts, among the stockholders, including this borrowing stockholder.  His stock is worth what his dues and other sources of revenue make it worth. What he paid in dues must go on his stock, to constitute the capital stock, as he contracted to pay such dues on his shares of stock, not on his debt.  Here he is a stockholder, not a debtor; his contract of subscription is for stock, and his dues go on that by contract.  Only in one event by the contract can those dues paid for stock go to pay the debt, that is, when, in case of success of the association, those dues, with dues from other members and other sources of income, bring the stock to par, and thus discharge the debt by the letter of the contract; but that being defeated by disaster, the set off of stock against debt cannot be made.  The member cannot be allowed to go on paying dues, in specific performance of the contract, for the company is incompetent to go on.  The time has come when outside debts must be paid, when members must suffer some loss.  It is obvious they ought to suffer this loss equally, borrowing and non-borrowing stockholders.  Now, if you credit A dues paid on his stock upon his debt, he gets the benefit of them in full, while B, who has no money borrowed from the association, but who paid the same amount of dues as A, gets no benefit from those dues.  This injustice cannot be allowed.  So, the true rule is, in case of insolvency, to keep A in his two-fold character, debtor and stockholder.  Make him pay back to the common treasury what he borrowed from it, and thus end his relation of debtor, and later, when the assets have been collected and the divisible funds, after payment of debts, is found, give him his share in that fund, much or little.  All shareholders will thus stand equal.  There are some authorities contra, but the great current of authority, the latest and best considered, as building associations have increased, sustain this position.  In the great case of *Strohen* v. *Franklin Savings Ass'n.*, 115 Pa. St. 273, the court stated the matter thus:  "The insolvency of the company puts an end to its operation as a building association; to a certain extent it also ends the contract between it and its members, and nothing remains but to wind it up in such manner as to do equity to creditors, and between the members themselves.  As regards the latter, care should be taken to adjust the burdens equally, and not throw on either borrowers or non-borrowers

more than their respective share. That result may be reached by requiring the borrower to repay what he actually received with interest. He would then be entitled, after the debts are paid, to a *pro rata* dividend with the non-borrower for what he has paid upon his stock. He will thus be obliged to bear his proper share of the losses. To allow him to credit upon his mortgage his payments on his stock would enable him to escape responsibility for his share of the losses, and throw them wholly upon the non-borrowers. In other words, the borrower would escape without loss. It will not do to administer the affairs of an insolvent corporation in this manner." To same effect see 5 Am. & Eng. Dec. in Eq. 254; *Leahy* v. *Building Association*, 76 N. W. 625, 5 Am. & Eng. Dec. in Eq. 206; *Price* v. *Kendall* (Tex. 1896), 36 S. W. 810; *Everman* v. *Smith*, 53 Ohio St. 174, (41 N. E. 139); *Weir* v. *Granite, Etc. Association*, 38 Atlan. 643; *Wohlford* v. *Assoc.* 40 N. E. 694, 140 Ind. 662; *Post.* v. *Association*, (Tenn.) 34 L. R. A. 201, 97 Tenn. 408; Thomp. Build. Assoc. 396.

The case of *Strauss* v. *Building Association*, 117 N. C. 308, is cited for the position that on the debt of a borrowing member of a building association must be credited all amounts paid by him, whether as fines, penalties, interest or dues; but it will be noticed that this member is to be charged with his debt and six per cent. interest and also his share of the defalcation or loss of the association, and credited with all moneys paid by him, including dues, according to the later case of *Williams* v. *Maxwell*, 31 S. E. 821, 5 Am. & Eng. Dec. in Eq. 224, 123 N. C. 586. This late case conforms to the right principle, only adopting another process of reaching the same end. It does credit on the debt dues paid on stock, but it adds to the debt and interest the borrowing member's share of the loss, estimated or ascertained by the court.

The circuit court decreed upon the principles above indicated, except that it allowed to the credit of borrowing stockholders the estimated present value of their stock as a credit on their debts. The court was not bound to do this until a final realization of the assets; but some courts have held that in view of the hardship and increased expense of settlement which may result from requiring the borrower to pay back all he received, without credit for dues paid, leaving him to final distribution for a return of the excess of his payments over what is really

due from him, wherever practicable, it should be ascertained what the receipts, profits and losses have been, what its liabilities, what its available assets, and what, accordingly, is the present value of every share, and credit it on the borrower's debt in respect of his shares, and charging him with his debt and interest reduced by partial payments of interest and premium. Endl. Build. Asso., s. 531. The circuit court did this in mercy to the stockholders, owing money for advances, and yet this is made the subject of complaint by the appellants as being premature and, therefore, incorrect in amount, or in the value of the stock. There can be nothing in this. Of course, the valuation of the stock is only approximate. Should it turn out later that the stock is worth more, the stockholders will get the benefit of it by further decree. I see no error in the principles of settlement adopted by the circuit court.

Appellants say that as there were two series, B and C, of stock issued, the losses under each should be kept separate, and stockholders in the one bear losses only in its time. That would keep two treasuries. That would make the association only a serial one. This association is not so fractioned. It merely issues from time to time stock, that is, offers it to bidders at different times, running from different times; but it is all the same corporation, same treasury; the fate of all interested in it is launched in the same boat. Even in a purely serial corporation there is but one treasury, and the losses are not separated as proposed. Many of the cases above cited, like *Leahy* v. *Build. Assoc.* 5 Am. & Eng. Dec. in Eq. 214, were pure serial associations, as this is not. 4 Am. & Eng. Ency. L. (2 Ed.) 1006, says: "The profits and losses are generally reckoned on the whole stock, and then divided equally among the different series, unless the rules provide otherwise." See Thomp. on Building Assoc. 14, s. 8, (2 Ed.); *Tyrrell, L. & B. Assn.* v. *Haley,* 163 Pa. St. 301.

Complaint is made that the commissioner's report found, or rather remarked, that stockholders in Series A were not members of the association, because their stock had matured and been retired before the date of the assignment. There was not anything in the record at the date of the decree of October 12, 1898, to show that this stock had not been properly retired and the money under it distributed. That is a matter precluded by that decree. The point was made for the first time after the decrees

had adjudicated all the principles of the case, and not even raised by the answer, and is first made apparent by a deposition of Young taken after those decrees, and that deposition could not form the basis of any decree upon the merits. Those stockholders were not parties, nor necessary parties, not interested in the controversy in this case, and if the fact relative to that matter would, in truth, entitle the other stockholders to any relief by any proper proceeding, it cannot reverse the decrees in this case. But Young's evidence does not show that the stock in Series A was improperly matured. It was matured on payment of eighty-four dollars on the one hundred dollars, giving a profit of sixteen dollars, said to be only six per centum for the period. Nothing shows that this was improper at the date of the maturity. The disastrous losses occurred afterwards. There is nothing to show want of solvency at that date. Why were not the members holding stock under Series A entitled to distribution? Nothing appears to the reverse. The distribution of Series A presumed correct until shown wrong. 4 Am. & Eng. Dec. Eq. 7.

As to the complaint that payments upon the debts made to the trustees after the assignment, were not credited at the proper time, there is nothing to show that they were not credited at the proper time. There was no exception on that score to the commissioner's report. In fact, there were no exceptions by the appellants to the commissioner's report or as to any of the matters above spoken of. They did not appear in the case until after the decrees adjudicated the principles of the cause. If there is anything in this point, it is only an error of calculation which can be corrected, and must be corrected, if at all, by motion in the court below. Why was it not brought to the attention of the court in the petition for rehearing?

The appellants complain that nine hundred and twenty-five dollars paid as interest on the debt of the Kilbourne Knitting Machine Company before the assignment was erroneously applied on the principal. How can that prejudice the debtor? It benefitted the debtor by diminishing the interest bearing principal.

As to the complaint that four *per centum* commission to the trustees was taken out of payments in advance of dues by the appellants before the application of the same. Some stockholders

had not paid up dues, and they were assessed with sufficient to bring them up to what they should have paid to the date of the assignment; others had paid in advance, and the commissioner in his process returned these advance payments to their payors, after deducting said per centage, the four *per centum* being the commission allowed by the assignment. These advance payments were moneys of those who had paid them, and the commissioner thought it proper to deduct commission before applying these moneys to the credit of those who had paid them, and he thought it not proper to charge such commission to the general fund. It did not double the commission of the trustees. It was charged to the parties prepaying, because there was no law to authorize prepayment. The benefit of this charge went to the general fund, as the trustees did not get double commission. I do not see any error in this, but if there is any error, as the amount of money is six thousand six hundred dollars, when the erroneous charge of commission is apportioned between the Middlesex Knitting Company and the Kilbourne Knitting Machine Company, and then consider what would be debited to them for commission on this money had it gone entire into the general fund, the amount of money by which they are prejudiced must be less than one hundred dollars to each of said companies. It cannot be the basis of reversal.

The assignments of error Nos. 10, 11, 13 and 14 complain that the present or withdrawal value of the stock of the indebted knitting companies was not properly ascertained; that too much money for cost of litigation was allowed by estimate in the process of ascertaining the withdrawal value of stock, and too large an amount allowed for bad debts, and that the value of the stock was not applied at the proper time, as also payments made after the assignment were not credited at the proper time. Now, as to the allowance of too much for estimate of costs of litigation and bad debts there can be no error. Those estimates were made in the process of the ascertainment of the present value of the stock, in order to give the debtor stockholders the relief of applying on their debts the estimated present value of their stock, instead of making them pay in full, without such credit, and compelling them to wait for their share in the assets, which might be finally due on their stock, until the final account. Now, the debtors had no right to demand the application of their

stock at any set time. It was matter of grace to accord it to them at all before final settlement. If too much was allowed for costs of litigation and bad debts, the outcome will show it, and the excessive estimate, or such part of the estimate as is excessive, will redound to the increase of the general fund that is to go to stockholders, and they will finally get it, and any overestimate of costs and bad debts will then be righted, will then go to the stockholders. I have above spoken of that feature of assignment thirteen which alleges that it was premature to estimate the present value of the stock to credit it to the relief of the debtor, because at the time of estimate there were no certain data for estimate. I said above that as the debtors were not entitled to this credit until final settlement, its allowance, to any extent, is a favor to them, and does not prejudice them, especially as that estimate is only an estimate, only an approximation, and if found to be too little, will be corrected hereafter.

As to the fifteenth assignment of error for the refusal to give the relief asked in the petition for re-hearing, treated by the court as a bill of review, it is sufficient to say that all the errors pointed out in that bill of review arise on this appeal.

The sixteenth assignment of error involves the same point.

The seventeenth assignment of error complains that the court refused any relief upon the answer of the knitting companies. The court expressed the opinion that the matter of the answer could not be considered, because precluded by the decrees which had been entered in the case before that answer was filed, and therefore declined to pass upon the matters set up in the answer. The decrees which had been entered adjudicated all the principles involved in the case, leaving nothing to be done in the case, save only to carry out the decrees. Any decree which adjudicates all the principles of the case and determines the principles and rules by which relief is to be administered to the parties, so that it is only necessary to apply such rules to the facts in order to decree the relative rights of the parties, is an appealable decree, in fact, a final decree. After such a decree it is too late for an answer introducing a defense to the bill, introducing new matter. The day for defense has gone by. If wrong has been done, it cannot be amended, unless there be such error as can be corrected on appeal. The circuit court could not review itself on that answer. The appellants had been served with process; they had

failed to appear. *Wood* v. *Harmison,* 41 W. Va. 376; *Core* v. *Strickler,* 24 W. Va. 689; *Fowler* v. *Lewis,* 36 *Id.* 130. Of course on those answers, if read to affect the former decrees could bring up nothing but error on the face of the record. Neither could a bill of review for error of law. *Wethered* v. *Elliott,* 45 W. Va. 436; *Dunn* v. *Renick,* 40 W. Va. 349.

While on the subject of that answer, having referred to it I will refer to its allegation that as a reason why the respondents had not appeared to the case sooner, that when process was served upon their agent, he called upon one of the plaintiffs, and was informed by him that he need not pay any attention to the proceeding as his rights would not be in any way affected or jeopardized. Shall I be called upon to decide whether such an expression of opinion as that by one of the trustees, his opinion of the law, as to what would be adjudged by the court upon.the many matters arising on the assignment, the nature of which must have been well known to the appellants, as no person was more largely interested as stockholders than they,—the appellants— I ask shall I say whether such an opinion of a trustee would affect the rights of the many interested as beneficiaries under the assignment? Shall I decide whether that mere expression of opinion could be held to be either a fraud or surprise upon the appellants affecting and impairing the decrees which were final in the case, when after that expression of opinion by the trustee, the appellants were served with notice by the commissioner by publication in a newspaper in their own town that he was proceeding to ascertain and report the assets, the debts of the association, the stockholders and their shares and what they had paid, and they still failed to appear. Shall I be called on to decide whether the failure of the appellants to attend to their interests in long pending proceedings constitutes *laches* on their part precluding them from setting aside decrees merely from an expression of a legal opinion by the trustee as to what would be done in the suit, when any body would know that he could not possibly know what would be done in the suits, and that at most gave no pledge or specification of what would or would not be done in the suit so as to warrant any suitor in relying upon it? I am excused from squarely deciding those matters, and for the following reasons. That expression of opinin by trustee Young is alleged to be a fraud lulling the appellants to sleep. If so, it

cannot be made the basis of setting aside the decrees by answer in this suit, because *Manion* v. *Fahy,* 11 W. Va. 482, and many other cases hold that to set aside a decree for fraud or surprise, whether that decree be interlocutory or final, an original bill is necessary. See *Springston* v. *Morris,* 47 W. Va. 50, (34 S. E. 766). It is not improper to say that fraud or surprise affecting a decree cannot be predicated on anything but a statement of fact, not a statement of law. *Mason* v. *Bridge Co.,* 28 W. Va. 639; *Love* v. *Teter,* 24 *Id.* 741. But the answer asks no relief on the score of the said matter. It simply prayed dismissal of the respondent with costs. It did not ask that the decrees might be impeached or affected in any way.

The appellants would at a late day upturn and revolutionize the entire adjustment of the affairs of this association, decrees and all, by an assault upon the validity of the deed of assignment. Though served with process, the appellants did not appear, but allowed the case to go on through many steps upon the bill taken for confessed as to them, without ever hinting that they had any objection to the validity of the assignment on the ground that the board of directors caused it to be executed by the president, without the authority of the stockholders. This point was first raised after the decrees adjudicated the principles of the case made in May and October, 1898, which fixed the rights of all the parties and settled the principles on which the large transactions and affairs were to be wound up. The bill of review presented this objection for the first time, the answer repeated it; but both bill of review and answer were after those appealable decrees, and therefore the point could not be then raised. Had the court gone back of the decrees into an investigation of this question, it would have been error, because those decrees stand essentially upon the basis stated in the bill, that that deed of assignment was valid; for if there was no deed of assignment, there could not possibly be any decree settling the affairs of the association entirely upon the existence, basis and validity of that deed of assignment, and those decrees are *res judicata* upon the existence and validity of that assignment. That assignment is initial point A of the whole proceeding and decrees in this case. The bill of review and answer could not re-open that question. *Crim* v. *Davisson,* 6 W. Va. 465; *McCoy* v. *McCoy,* 29 *Id.* 794. Moreover, the bill set up this deed of assignment as the basis of relief, and alleged that the building

association as a corporation had "made its certain deed of trust or assignment, whereby it conveyed," etc., giving date of the deed and exhibiting it. That was not controverted in any way. It is well settled that when a deed is executed under the corporate seal of a corporation, it is presumed that the deed was executed by proper authority from the corporation, and in due course of law appropriate to the matter, until it otherwise appears in allegation and proof. *Fidelity Co.* v. *S. V. R. R. Co.,* 32 W. Va. 244; *Lamb* v. *Cecil,* 25 *Id.* 288; 4 Thomp. on Corp., ss. 5029, 5105, 5106.

Suppose, however, that the appellants were not precluded by the bill taken for confessed against them and the decrees thereon fixing the rights of the parties. Still, they would be debarred from upheaving things as they propose because of their *laches* in assaulting the deed on this merely technical point, merely technical when everybody admits that the association was wholly insolvent, unable to go on, and that the assignment was only what the stockholders surely would have done, or a court of equity would have done through a receiver. Not only would they be debarred by *laches,* but the appellants would be also thus debarred by their acts of recognition and ratification of that assignment. The deed of assignment was 24th September, 1897. Active steps were taken by the trustees by the institution of the suit to wind up in November, 1897. In February, 1898, on the bill taken for confessed the case was referred to a commissioner to report the assets, debts and stockholders, and the amount paid by the stockholders. The commissioner reported these things, and on 28th May, 1898, a decree was made confirming the report, and another reference was made to the commissioner to settle the accounts of each stockholder with the association and with other stockholders, and to report a scheme by which stockholders could be made equal in the distribution of the assets. Upon the second report, a decree of confirmation was entered settling the rights of all the parties in October, 1898. In February, 1899, for the first time the knitting companies sought to raise this question of the validity of the assignment. Before that they had paid on their debts and stock, after that assignment, large amounts of money to the trustees under the assignment, thus recognizing and ratifying that assignment in solemn manner. Besides, they knew that the court had ordered the disbursement under that assignment of large amounts of money, thousands of.

dollars, including what they paid, to divers parties nere and there, which likely never can be reclaimed. If these knitting companies had anything to say against that assignment, which was an absolute necessity, and such as a court would have authorized, why did they not answer the bill, which predicated relief on that assignment as valid? Why let tne proceeding go on, before commissioner and court, for fourteen months, and decrees and orders entered on the basis of that assignment, without whispering a whisper of its technical invalidity? This acquiescense, failure to speak out in solemn legal proceedings, when called upon to speak, this ratification by payments under the assignment bar the knitting companies from setting up the invalidity of the assignment. *Fidelity Co.* v. *R. R. Co.,* 32 W. Va. 257. As to the unauthorized acts of directors and stockholders of a corporation the rule is that "where the stockholders stand by and witness a course of action, without objecting, *their supineness* is construed to be an acquiescence or ratification, and they will not be heard in equity to complain, after the lapse of such a length of time that other rights may supervene, which it would be inequitable to disturb." 4 Tomp. Corp. s. 5298. In section 6473, particularly speaking of an assignment of a corporation made by the directors without the authority of the stockholders, the same work says: "It is scarcely necessary to add that such an assignment, even if made without original power on the part of the directors, would be validated by the subsequent assent or acquiescence of the stockholders; and, on the other hand, that a stockholder may be precluded by his *laches* from questioning such an assignment."

Thus we find no error in the decrees under the assignments made by the appellants.

The trustees cross-assign two errors. One is, that the court overruled the commissioner, as asked in the bill of review filed by the knitting companies, by decreasing the interest from six *per centum,* as calculated by the commissioner, to five *per centum* on the ten thousand dollars at which the Middlesex Knitting Company purchased from the association real estate in Martinsburg. The trustees say that the by-laws and statute require that all loans by the building association should bear six *per centum* interest, and that the said real estate was nothing but a loan as if money, and that the provision in the contract between the association and said company charging only five *per*

*centum* is a violation of law. The trustees say that the charter, statutes and by-laws must be conformed to by borrower and association, and constitute a part of the contract, and where the contract is repugnant thereto it must yield and be interpreted according to the law of charter, statute or by-laws. Such is the law. *Savage* v. *Build. & Loan Assn.*, 45 W. Va. 275; *State* v. *Nutter*, 44 *Id.* 385; *Build. Assn.* v. *Tinsley*, 96 Va. 322; *McCahan* v. *Columbia etc.*, 40 Md. 226; Thornton & Blackledge on B. A., s. 287; Thomp. on B. A. 87, 357. When one contracts with a building association, he is charged with notice of the law of its being, and is held to contract accordingly. These principles are plain, and strongly incline me to disagree with the circuit court in this matter; but when I reflect that this transaction was not purely a money loan, but a purchase of real estate, that the purchase element entered into it, and that the purchaser got real estate and not money, and had right to make terms of purchase. I conclude to waive my doubts, and think that the Court ought to agree with the circuit court on this doubtful matter.

The other cross-assignment of error contends that the contracts between the association and the knitting companies, so far as they fix a definite amount and number for weekly dues on stock until the payments would amount to eighty-eight dollars are violative of the plan of the association, which, as well as the statute and by-laws, requires payments to go on until the stock reaches par, whereas this contract lets off these borrowers with the payment of only eighty-eight dollars per share. I do not doubt the proposition of the appellees. The contracts would be construed to conform to the by-laws and statutes, and enforced as if so drawn; but the question is immaterial, because that contract, as regards further payments, on stock, has been rescinded by the insolvency of the association.

Decrees affirmed.

*Affirmed.*