# CHARLES TOWN.

WELLSBURG AND STATE LINE RAILROAD COMPANY *v.* PAN HANDLE TRACTION COMPANY, *et al.*

Submitted June 9, 1904.   Decided September 12, 1904.

1.  RAILROAD—*Public Crossing.*
    The acquisition of a crossing by one railroad over another involves a taking of private property for public use.   (p. 23).

2.  RAILROAD—*Condemnation—Jurisdiction.*
    Section 11 of chapter 52 of the Code of 1899 does not confer upon courts of equity jurisdiction to condemn the property of one railroad, turnpike or canal company for the purpose of a crossing by another railroad, turnpike or canal company.   (p. 21.)

3.  RAILROAD—*Court—Jurisdiction.*
    By said section, such courts are empowered to determine the exact places at which, and the manner in which, such crossings may be made, when the parties are unable to agree; but the right to cross must be obtained by proper proceedings under chapter 42 of said Code, when it cannot be secured by consent and agreement of parties.   (p. 23).

4.  RAILROAD—*Public Crossing—Courts.*
    The place and character of the crossing to be decreed, when the parties fail to agree, are determined by the situation of the parties, the public interests, the topography of the place, the connections to be made, the expense of making the crossing and all the material facts and circumstances, affecting the public and the rights of the parties immediately concerned, and not upon the choice and will of the party desiring it.   Hence, the court may decree a crossing other than the one described in the bill.   (p. 32).

5.  RAILROAD CROSSINGS.
    Railroad crossings at grade are neither prohibited nor discriminated against by the statute.   On the contrary, they are expressly authorized, and, when the parties fail to agree, the

court may order such crossing to be made, as, under all the circumstances, is fair, just and reasonable, viewed from the standpoint of the parties interested, and promotive of the public welfare. (p. 30).

6.   RAILROAD CROSSINGS.

The clause in section 11 of chapter 52 of the Code, reading as follows: "Provided its work be so constructed as not to impede the passage or transportation of persons or property along the same," neither contemplates nor prohibits such impediments as are merely incidental to a properly constructed crossing at grade. (p. 29).

7.   RAILROAD CROSSINGS.

Wherever a crossing is necessary in the construction of a railroad, the law allows it and confers the right to obtain it; but this power is to be exercised, in the absence of an agreement by the parties, under such conditions and limitations, as to the place and mode of crossing, as a court of equity may justly impose, in view of the interests of the parties and the public. (p. 21).

8.   STATUTE—*Construction.*

In the construction of a statute, its spirit, rather than its letter, is the guiding star, but contradiction and repugnance must be avoided, when it is possible to do so. The statute must be construed as a whole and every word in it made effective, if possible. (p. 30).

9.   STATUTE.

A clearly expressed intention in one part of a statute does not yield to a doubtful construction of another portion of it; and when the general intention of the legislature is clear and the spirit and purpose of the statute are manifest, a mere implication or inference of a contrary particular or special intent, arising out of language of doubtful meaning, must yield to the general intent. (p. 30).

10.   STATUTE—*Construction.*

Where the language of a statute is ambiguous or the meaning doubtful, the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy may be resorted to in seeking its true meaning and purpose. (p. 31).

11.   LEGISLATION.

An undeviating course of legislation in a certain direction through a long period of time, in an effort to systematize and perfect the law relating to a given subject, strongly emphasizes the express language embodying the final declaration of legislative will. (p. 31).

**12.** STATUTES—*Construction.*

All former statutes on the same subject, whether repealed or unrepealed, may be considered in construing provisions that remain in force.  (p. 31).

**13.** PLEADING—*Bill.*

Uniting a purely legal demand with an equitable demand, in a bill seeking the enforcement of the latter, does not render the bill multifarious.  (p. 26).

**14.** PLEADING.

In such case, the allegations respecting the legal demand may be treated as surplusage and ignored.  (p. 26).

**15.** PLEADING.

The extent to which facts must be set out in a bill depends upon the nature of the principal facts to be established.  When a general term used has a double meaning, and, standing alone, may import either a mere fact or a conclusion of law, it must be accompanied by a statement of such additional facts as constitute ground for the legal conclusion, which the plaintiff undertakes to establish, else the rule that pleadings must be certain to a common intent is violated.  (p. 27).

**16.** BILL—*Pleading.*

Bills filed under section 11 of chapter 52 of the Code are governed by the ordinary rules of equity pleading, applicable to bills in general, and a bill so filed is sufficient, if it so states the plaintiff's case as to inform the defendant of what he is called upon to meet.  (p. 27).

**17.** SUIT—*Decree—Costs.*

When, in a suit under section 11 of chapter 52 of the Code, the court decrees a crossing substantially different from the one demanded of the defendant before the institution of the suit, a decree for costs against the plaintiff is proper.  (p. 37).

Appeal from Circuit Court, Brooke County.

Bill by the Wellsburg & State Line Railroad Company against the Panhandle Traction Company and others.  Decree for plaintiff, and defendants appeal.

*Affirmed.*

HENRY M. RUSSELL, for appellants.

J. J. CONIFF and JOHN P. ARBENZ, for appellee.

POFFENBARGER, PRESIDENT:

The Pan Handle Traction Company, chartered under the laws

of this State as a railroad corporation, and operating an electric railway about sixteen miles long between the City of Wheeling in Ohio county and the City of Wellsburg in Brooke county, seeks relief from a decree, pronounced against it, by the circuit court of the latter county, in a suit, brought under section 11 of chapter 52 of the Code of 1899, by the Wellsburg and State Line Railroad Company, another railroad corporation of this State, organized for the purpose of constructing and operating a steam railroad, to commence, according to the terms of its certificate of incorporation, "at or near the county of Brooke in said State of West Virginia, and run thence by the most practicable route to a point at or near the Pennsylvania State line, at Dunsford in the County of Washington, in the State of Pennsylvania," authorizing a crossing at grade of the said electric railway line by the said steam railroad line, on payment of such damages as shall be ascertained by a condemnation proceeding under the provisions of chapter 42 of said Code.

If the status of the Wellsburg and State Line Company is such as confers upon it the right to cross the track of another railroad, an inquiry which will be deferred for the present, the relation of the two roads to each other is such as to render a crossing at or near the point designated in the decree, proper and highly necessary to effectuate the declared purposes of said corporation. If built as proposed, its line will run, reversing the description in the certificate, from Dunsford, in a westerly course, to the Pittsburg, Wheeling and Kentucky Railroad at the Ohio River, crossing the line of the Pan Handle Traction Company in order to make the connection with the P. W. & Ky. railroad. Without a crossing at some point, the connection cannot be effected, as the P. W. & Ky. road lies between the Pan Handle Traction Company road and the Ohio River from Wheeling to Wellsburg. Upon a railroad company so situated, the statute confers the right to a crossing and provides for its enforcement. It says: "If any railroad, turnpike or canal company shall deem it necessary in the construction of their work, or any branch or siding thereof, to cross any other railroad, turnpike, or canal, or any state or county road, at grade or otherwise, it may do so" etc. and, further, that, "In case the parties interested fail to agree upon such crossing, * * * * the company desiring it may bring its suit in equity" etc.

The defense, based upon grounds not in conflict with these views, is raised in part by a demurrer in writing, specifying four principal causes, three of which deny the sufficiency of the bill, viewed as one invoking the power of eminent domain to take from the defendant company part of its property and the remaining one its sufficiency as a bill, seeking merely a crossing of one railroad by another. Dealing with the bill from the first point of view, the demurrer says the property asked for cannot be taken because it is already devoted to a public use from which it cannot be diverted for another similar use of no higher nature than that for which it was originally acquired; because the bill does not aver that the property demanded is unnecessary for the enjoyment and exercise by the defendant of its franchise; and because there is no specific averment that the plaintiff will devote that property to a public use. Viewing the bill as one filed under the statute to obtain a crossing, the lack of such particularity in the description of the proposed crossing as will show how it will affect the defendant company's railway, and failure to show impracticability of crossing otherwise than at grade, are assigned by counsel for the defendant as grounds of demurrer.

A clear understanding of the nature of the right desired by the plaintiff will facilitate the disposition of the questions raised by the demurrer, including the supposed distinction between a bill for the taking of private property for public use and one seeking a mere crossing. That a crossing of the right of way and track of one railroad company by the track of another amounts, at least, to the acquisition of an easement by the latter over property owned by the former, is so manifest as to render discussion or citation of authority to that effect useless. However, it has been, in effect, so decided in *Tuckahoe Canal Co.* v. *Tuckahoe & James River R. R. Co.*, 11 Leigh 42. In that case, Judge Tucker makes it clear that the property owned by an internal improvement company and used by it in the exercise of its franchise is not the franchise itself, but is, on the contrary, private property subject to the *jus publicum*. Whether, in obtaining such crossing, the ownership of the fee is affected or disturbed does not enter into this inquiry. The acquisition of a right of way only over the property of another is the taking from that other of a thing of value, a valuable right to the use of the

land for certain purposes, and it can be done without the consent of the owner, only in the manner and upon the terms prescribed by law. In the case above referred to, the celebrated jurist who delivered the opinion of the court said: "The Tuckahoe Railroad Company set up a pretention to run their road across the canal, on a bridge of a certain elevation. They are not content with passing on side by side with their rival, but they assert a right by their charter to cross his line of improvement. This brings us to the inquiry, how far the legislative power is adequate to the grant of such a right?" After discussing the question at considerable length, he expressed his conclusion as follows: "I think it was competent to the legislature to empower the Railroad Company to cross the line of the canal, whether the Canal Company be regarded as the proprietors of the soil or of a mere right of way. If they are proprietors the soil, then they hold it by the same tenure that every man holds his land; that is, subject to the *jus publicum.* If it is a mere right of way to which they have title, the argument applies with yet more force, since the power to condemn the land itself is greater than that of condemning an easement upon it."

From this application of legal principles, as well as the obvious nature of the right desired by the plaintiff, in respect to the property of the defendant, it is apparent that the former contemplates the taking of private property for public use under the power of eminent domain. But can that power be invoked in a court of equity? What is the function of the suit in equity authorized by the statute? The language of the statute itself seems to fully answer these questions. It says: "In case the parties interested fail to agree upon such crossing or alteration as is desired, the company desiring it may bring its suit in equity, and in such suit the court may, in a proper case, decree that such, or any proper crossing or alteration may be made, *upon payment of damages, to be ascertained as provided in chapter forty-two of the Code, and the company desiring such crossing or alteration may thereupon proceed under said chapter to obtain the right to make such crossing or alteration."* The power of condemnation is legislative, not judicial, and exists in the courts only by express authorization and only to such an extent as it has been expressly vested in them. The statute above quoted prescribes the decree to be entered, and stops short

of giving the right of occupation of the crossing. It expressly says: "The right to make the crossing" may be obtained in another proceeding and that is in a court of law, where the right to have a jury ascertain the amount of compensation, may be demanded. Property cannot be taken until just compensation therefor is paid or secured to be paid. Before payment it must be ascertained in such manner as is prescribed by law. Const. Art. 3, section 9. Chapter 42 of the Code prescribes the manner, and it authorizes proceedings in the law courts only. There is no jurisdiction in equity to ascertain and decree compensation for damages to property. *Ohio River Ry. Co.* v. *Gibbens,* 35 W. Va. 57; *Ward* v. *O. R. R. Co.,* 35 W. Va. 481. Equity has jurisdiction to prevent the construction of a work of internal improvement, where it would work such injury to private property, not actually taken, as virtually destroys its value, until compensation for the injury is paid or secured to be paid, and, in such case, an issue out of chancery will be directed to ascertain the amount of compensation. *Mason* v. *Bridge Co.,* 17 W. Va. 396; *Teter* v. *W. Va. Cen. & Pa. R'd Co.,* 35 W. Va. 433; *Ward* v. *O. R. R. Co.,* 35 W. Va. 481. Of course equity would restrain an internal improvement company from actually taking property without having paid, or secured payment of compensation therefor, but whether in that case it would direct an issue out of chancery to determine the compensation to be paid has not been decided by this Court. But, even if that could be done, there is no shadow of jurisdiction in equity to entertain such a proceeding as is prescribed by chapter 42 of the Code, the only one by which an internal improvement corporation may obtain private property for public use.

Reference to the history of the section under consideration and railroad legislation in general will tend to enlighten as to the legislative purpose in authorizing the suit in equity. Under the first general railroad act, which was passed March 11, 1837, railroad companies had authority to enter upon and take land and crossings, necessary to the construction of their lines, before ascertainment or payment of the purchase money, and courts were prohibited from enjoining them, unless it was "manifest that they, their officers, agents or servants" were "transcending the authority given them by" that "act, and that the interposition of a court of equity" was "necessary to pre-

rent injury that" could not "be adequately compensated in dam-ages." In that act, the basis of what is now section 11 of chapter 52 of the Code was embodied, but without any restriction up-on the making of the crossing before payment of compensation. It was under that act, that the case of *Tuckhoe Canal Co.* v. *Tuckhoe & James River R'd Co.*, cited, arose, and, on this point, Judge Tucker said: "It seemed to be considered by the counsel, that the condemnation must precede the execution of the work. This is, I conceive, a misconception of the law. The company have a right to proceed with their work before condemnation." In the Code of 1849, the section, as amended, reads thus: "If any railroad, turnpike or canal company deem it necessary in the construction of their work to cross any other railroad, turn-pike or canal, or any state or county road, it may do so, provid-ed its work be so constructed as not to impede the passage or transportation of persons or property along the same. If any such company desire that the course of any other railroad, turn-pike, canal, or state road should be altered to avoid the necessity of any crossing, or of frequent crossings, or to facilitate the crossing thereof, the alteration may be made in such manner as may be agreed between the company desiring such alteration, and the other railroad, turnpike or canal company, or the board of public works in the case of a state road. And if such con-struction or alteration as is allowed by this section shall cause damage to any company, or to the owner of any lands, the rail-road, turnpike or canal company first mentioned shall pay such damage. But any county road may be altered by any such com-pany for the purpose aforesaid, whenever it shall have made an equally convenient road in lieu thereof." Code of 1849, chapter 56, section 24. It remained in this form in the Codes of 1860 and 1868. Whether the insertion of the clause providing for agreement as to the manner of crossing made it necessary to condemn before crossing, when the parties failed to agree, was never decided. For such contingency, the statute made no ex-press provision. The Constitution of 1863 did not require pay-ment, or security for payment, of compensation for private prop-erty taken for public use before the taking of it. But the Con-stitution of 1872 does, and this section, concerning crossings, and other statutes have been amended so as to conform to this new constitutional limitation. The act approved April 3, 1873,

providing for the incorporation and regulation of railroad companies, although somewhat indefinite, seems to be in conformity with the constitutional provision. But the act of March 10, 1881, amending and re-enacting the section here involved, with others of chapter 52 of the Code, removed all doubt, if there was any, and made the legislative intent clear, by expressly saying that, in case of disagreement, the right to cross shall be obtained by condemnation under the general law, governing condemnation proceedings, after having obtained by decree in equity a designation of the place at which, and specification of the manner in which, the crossing desired shall be made. The statute, as it now stands, is an expression of legislative will, and a legislative interpretation of section 9 of Article 3 of the Constitution, to the foregoing effect. It says the taking of a crossing is the taking of private property, for which the proceeding must be under chapter 42, and not under this section, except to the extent of determining where and how the crossing shall be made.

In view of this conclusion, it is immaterial whether the allegations of the bill, purporting to set up a demand for a decree for actual possession and use of the crossing, are such as would constitute a sufficient application under chapter 42 of the Code or not; for the granting of the relief to be obtained under that chapter is not within the jurisdiction of a court of equity, and that court will not inquire into the matter of their sufficiency. It will in no sense take cognizance of that sort of a case. For the same reason, these allegations do not make the bill multifarious. "The uniting a purely legal demand in a bill, which seeks the enforcement of an equitable demand, will not render the bill liable to be dismissed as multifarious." *Smith* v. *Patton,* 12 W. Va. 541; *Smith* v. *McLain,* 11 W. Va. 654; *Pyles* v. *Furniture Co.,* 30 W. Va. 123. In so far as these allegations were not essential or proper in a bill to settle differences as to where and how a crossing shall be made, it was proper to disregard them as surplusage.

The bill designates the point at which the crossing is desired and the necessity of such crossing and shows such necessity by facts alleged. It also avers that the construction of plaintiff's road across that of the defendant company will not impede the passage or transportation of persons or property along the latter road. Must it go further and show just how it will affect the

track of the defendant company and that an undergrade or over-grade crossing is impracticable? The statute confers the right to cross "at grade or otherwise," when necessary and possible without impeding passage and transportation, and provides a remedy for the enforcement of the right when withheld. Want of necessity, impracticability of effecting any crossing or the impropriety of crossing at a point, or in a manner, specified, are all matters of defense and substantially covered by the allegations of the bill. In other words, the interposition of any one of them is possible only by denial of some material averment of the bill. Tested by the general rules and principles of equity pleading, the bill seems to be sufficient. A bill need not set out the evidential facts necessary to sustain its general allegations. The extent to which facts must be detailed depends upon the nature of the main fact to be set up. When the general term used for it may be equivocal and stand for a simple fact or a conclusion of law, as, for instance, the word "fraud," the rule of "certainty to common intent" demands the statement of sufficient facts to show that the acts complained of, and intended to be established by the evidence, constitute fraud, but even here, the evidence need not be detailed. All facts necessary to constitute a foundation for the legal conclusion that the plaintiff is entitled to the relief he desires must be alleged, but conclusions of law alone are insufficient, and violative of the rule of certainty in pleading. *Billingsley* v. *Menear,* 44 W. Va. 651; *Vance Shoe Co.* v. *Haught,* 41 W. Va. 275; *Zell Guano Co.* v. *Heatherly,* 38 W. Va. 409; *Pyles* v. *Furniture Co.,* 30 W. Va. 123; *Newberger* v. *Wells,* 51 W. Va. 624, 639. All the essential facts here are of such character as to require no great degree of particularity and minuteness of statement in giving the bill the prescribed degree of certainty. Whether the crossing is necessary and practicable are matters of almost pure fact, dependent upon the evidence, and involving scarcely any application of the principles of law in their determination. The simple demand of a crossing at a given place, with a general specification of the kind of crossing desired, preceded by the necessary averments of the character of the plaintiff and necessity of the crossing would seem to be sufficient to apprise the defendant of everything that can be involved in any issue that can be made up between the parties. In order to fulfill the requirements of the

rule, the plaintiff need only so state his case "as to inform the defendant of what he is called upon to meet." *Zell Guano Co.* v *Heatherly,* 38 W. Va. 409. We think the demurrer was properly overruled.

The answer denies the right claimed by the bill on the ground that the plaintiff is not, and will not be, when completed, a common carrier, but a mere private coal road. To sustain this position, the defendant relies upon the shortness of plaintiff's line; its failure to make connection with any railroad except the P. W. & Ky., at the Ohio River; the fact that the Wellsburg Coal Company, a corporation having for its stockholders the same persons who own the stock of the plaintiff railroad company, owns one thousand acres of coal land through which the railroad will be constructed and operated; and the admission of the vice-president and chief engineer of the plaintiff, that the principal object in constructing the road is to provide means for transporting the coal from the Wellsburg Coal Company's land. It further appears from the testimony of this witness, however, that the stockholders of the plaintiff intend to obtain a charter under the laws of Pennsylvania and extend the road from the state line to Tylerdale, near Washington, Pennsylvania, where connection will be made at the east end of the line with the Baltimore and Ohio and other railroads; that the entire length of the road, so extended, will be twenty-eight miles; that the road has been graded and rails laid for a distance of three miles, commencing at the west end, and rights of way acquired for some distance beyond the grading towards the state line; that the road will be equipped with cars and coaches for the general transportation of freight and passengers; and that the road will be, in all respects, a common carrier. This evidence is uncontradicted, and nothing tends towards its overthrow except the circumstances of ownership, by the stockholders by means of corporate organization, of the coal land, and its being the principal inducement to the investment in the railroad company. But they do not exclude the intent to operate a railroad as a common carrier. The several purposes of the corporators may consistently stand together. Other motives than the mere operation of a common carrier, and other works of internal improvement, always move the people who build them, else none would ever be constructed. They constitute fields of profitable invest-

ment, direct and indirect, and have a double character which the law recognizes and upholds. For some purposes they are private and for others public, and the private right which the stockholders and creditors have in respect to them, constitute the sole inducement to their construction and operation. For the purposes of this case, it suffices to say the evidence relied upon in support of this defense is insufficient to sustain it.

Another defense, raised by the answer, rests upon a view of the statute which, if adopted here, would reverse the decree. It is that the letter of the statute must be observed, and no crossing can be allowed that will, in any manner, or to any extent, "impede the passage or transportation of persons or property along" the road over which a crossing is sought. If this is a correct interpretation, there can be no crossing at grade, except by consent, under any circumstances, however imperious the necessity may be; for every such crossing is an impediment in a certain sense. In the language of counsel for the appellant, "The necessity to stop the defendant's cars when a train might be upon the crossing, or approaching the crossing, would be an impediment. The necessity to reduce the speed of the cars and to wait for a signal from the watchman would be an impediment. The constant danger of accidents would be a most serious interference with the defendant's operations." Thus, adherence to the letter of the proviso, found in the section under consideration, would defeat, in part, the very right which the legislature has plainly attempted to confer by the express language of one part of the section, the crossing of one railroad by another at grade. The section must be taken as a whole and so construed as to give effect to every word in it, if possible. Contradiction, if there be any, must be reconciled, by choosing, from the different meanings a word or clause may have, that one which will harmonize with other parts of the instrument. The spirit of the statute, rather than its letter, is the guiding star, but the letter also is to be regarded, and given effect if possible. *Gas Co.* v. *Wheeling,* 8 W. Va. 320; *Brown* v. *Gates,* 15 W. Va. 131; *Jackson* v. *Kittle,* 34 W. Va. 207; *Bank* v. *County Court,* 36 W. Va. 341; *Baxter* v. *Wade,* 39 W. Va. 281. Keeping this general rule of construction in view, due weight must be accorded to the absence of any expression of preference in the statute for crossings other than grade crossings. It does not say, as do the

statutes of some of the states, that a crossing at grade shall not be made, where it is practicable or possible, to make an over-grade, or under-grade, crossing. On the contrary, it confers the right to a crossing at grade or otherwise, and authorizes the courts of equity to prescribe the kind of crossing when the parties fail to agree. If there is any discrimination against grade crossings, it is by implication arising out of the proviso, forbidding the impeding of traffic, and, if such effect is to be accorded to it, the right to a grade crossing, expressly conferred by the preceding clause of the section, is taken away entirely. As already indicated, well settled principles of law compel the courts to avoid, by construction, when it is possible to do so, an interpretation of a statute that will leave any part of it noneffective and dead. "Conflict and repugnance in statutes should always be avoided by construction, if possible. Indeed a statute ought upon the whole to be so construed that, if it can be prevented, no clause, sentence or word should be superfluous, void or insignificant." LUCAS, JUDGE, in *Jackson* v. *Kittle,* 34 W. Va. 216. A right expressly given in one part of an instrument cannot be taken away by a mere implication arising out of another part of it, which is not one of necessity, if it can be taken away by implication at all. Thus, "A clearly expressed intention in one portion of a will is not to yield to a doubtful construction of any other portion of the instrument. When the general intent of the testator is clear, and it is impracticable to give effect to all the language of the instrument, expressive of some particular or special intent, the latter must yield to the former; but every expressed intent of the testator must be carried out when it can be done." *Bell's Admr.* v. *Humphrey,* 8 W. Va. 1, 6. The peculiar nature of the subject with which this section deals and the prevalent conditions and practices relating to it must be kept in view. Necessity, convenience and practicability of the grade crossing have been demonstrated and fixed by experience. Though discriminated against by legislation in some states, they are nowhere prohibited. For reasons of economy, peculiarity of topography or connection, or others, they are found everywhere, and yet the great transportation lines of the country are operated with reasonable safety and rapidity over them. So general is the use of them that vast sums of money are constantly laid out in derailing switches, electric bells, and for watchmen and other

safeguards. They are found in densely populated cities, where trains crowd upon one another, and on the broad plains, where long reaches of straight and level track are passed over at the highest possible rates of speed. Of such infinite variety are the topographical, financial, commercial, operative and other con-siderations involved, that the possibility of railroad construction and operation without them has not yet been demonstrated.. Are we to assume that the legislature intended to ignore all these weighty conditions· of the subject matter of its action; to ob-struct, rather than facilitate, railroad business; make new condi-tions, instead of dealing with existing ones; arbitrarily substi-tute its own judgment, contrary to all experience, for the usual, ordinary and necessary methods of railroad construction? To do so would violate another firmly established rule of construc-tion. "Where the language of a statute is in any manner am-biguous, or the meaning doubtful, resort may be had to the surrounding circumstances, the history of the times, and the defect or mischief which the statute was intended to remedy." *Smith* v. *Townsend,* 148 U. S. 490; *Daniel* v. *Simms,* 49 W. Va. 554, 556. Besides observing the express language of the statute, the subject matter of the section and conditions affecting it, and the rules of construction adverted to, the progress and course of legislation with reference to crossings, through a period of more than forty years, must have due weight in seeking the true mean-ing of the language used. An undeviating course of legislation in a certain direction, in an effort to systematize and perfect the law, strongly emphasizes the express language embodying the final declaration of legislative will. "All former statutes on the same subject, whether repealed or unrepealed, may be con-sidered in construing provisions that remain in force." *United States* v. *Le Bris,* 121 U. S. 278; *Daniel* v. *Simms,* 49 W. Va. 554; *Forqueran* v. *Donnally,* 7 W. Va. 114. The act of 1837 made no reference to any special kind of crossing. It simply gave right to cross. Such was the form of the section in the Codes of 1849 and 1860 also. To give more definiteness and greater certainty of expression, the legislature, by the act of April 3, 1873, conferred upon every corporation formed under it, power "To cross, at grade, or to cross over or under, inter-sect, join and unite its railroad with any other railroad," etc. To concentrate all that is embodied in so much of the foregoing

language as concerns crossings into fewer words, the act of March 10, 1881, provided that crossings may be made "at grade or otherwise." These weighty considerations against it make manifest the impossibility of adopting the construction contended for by counsel for the appellant, founded upon a mere implication drawn from the strict letter of the proviso, if the language of the proviso is susceptible of any other reasonable meaning, and, even if it is not, it might have to yield under the several rules of construction referred to.

But this is avoided by the conclusion reached by the learned judge of the circuit court, which is undoubtedly correct, and in perfect accord with the foregoing rules and expression of views. He says: "Therefore it cannot mean that the obstruction and delay due to the passing of trains or the danger of accidents at grade crossings are to be considered as things which impede transportation within the meaning of the statute. The terms used in the statute make this clear. It is not provided that, as a result of the crossing when built, there shall be no impediment to traffic, but the requirement is that the work shall be so constructed as not to impede." The statute refers to the manner in which the work shall be constructed and not to the incidental effect of the crossing due to the passing of trains and cars over the roads. A moment's reflection suggests that any kind of crossing may be so constructed as to impede the passage of persons and transportation of property. An over grade or under grade crossing could be so made, and the only purpose of the proviso is to compel avoidance of all impediments and inconveniences not necessarily incidental to a properly and skillfully constructed crossing, leaving it to the court to say, passing upon all the facts and conditions involved in each particular case, what crossing shall be made, when the parties interested cannot agree.

All this being determined against the appellant, its counsel still says the decree is wrong, because, under the circumstances, an overgrade crossing, if any, should have been ordered by the court. This contention rests principally upon the impossibility of making a smooth, even crossing. The point of intersection, fixed by the decree, is on a grade of the traction company's road, descending towards the north, and approaching Buffalo Creek, near which it runs on trestle work, and on a curve in the steam

railroad track, in consequence of which, the outer (northern) rail of its track at that point must be higher than the inner rail. As first proposed, the difference in height was five inches, such as scientific construction requires, for a speed of about twenty-one miles per hour, on a curve of the degree in question, in order to overcome the centrifugal force when a train is running over it, which varies with the speed of the train. The decree provides that the difference shall not exceed one inch, and, further, that the track of the electric road "north and south of the crossing shall be graded so as to smooth out the crossing at the expense of the plaintiff." This, however, still leaves an irregular hump in the track of the defendant company's road. It converts a down grade going north, into about a two per cent. up grade, and *vice versa,* running south, and, as the crossing is not at right angles, a car passing over it on the electric road will be thrown into a slight twist, for opposite wheels of the car truck will not pass over simultaneously. This irregularity, the necessity for the exercise of caution in approaching the crossing, arising from the possibility of collision with trains from the other road, and the actual occupation of the crossing by the trains of the steam railroad at times will compel the electric cars to reduce their speed, and occasionally even stop, at that point, and, to that extent, impede the passage of persons and transportation of property along the electric road. For these reasons, and because defendant's track must be altered to enable the plaintiff to cross at all without stopping traffic on the defendant's line, it is urged that the court should have decreed an overgrade crossing.

For an overgrade crossing, two plans were suggested, one by each party to the controversy. As the P. W. & Ky. R. R., with which the new road coming from the east desires to connect, lies along the bank of the river, and the electric railway track next to it, with a narrow strip between them, the first plan, produced by the plaintiff, carries the new road over the tracks of the P. W. & Ky. road and the Pan Handle Traction Company road, and makes it join the P. W. & Ky. road on the west side thereof. The other carries it over the electric company's track only and then down the narrow strip between the two existing roads so as to join the P. W. & Ky. track on the east side. The first involves a much higher crossing than the other, and, therefore,

longer approaches over worse ground, and much greater cost. Constructed of piling and wooden trestle work, its cost is estimated at over $100,000.00 and of stone and steel or iron, over $200,000.00. To construct the other, it would be necessary to take part of the right of way of the P. W. & Ky. R. R. Co. or the Pan Handle Traction Co., or both, and besides these difficulties, the cost would still be not less than $30,000.00. Speaking of the cost, after considering both plans, the learned judge of the trial court said: "It will be out of all proportion to the proper cost of a crossing when we consider the probable amount of money expended in the construction of either of the roads concerned in this case."

The road to be crossed is an electric road, permitting greater latitude in respect to grades, curves and regularity of track than in the case of a steam railroad, having heavier and longer rolling stock, and none of the several civil engineers and others experienced in electric railway construction, examined as witnesses in the case, have pointed out any serious consequences that are likely to result from the construction of the crossing as prescribed by the decree, other than the dangers and inconveinces incident to grade crossings generally. Uniformity in grade of the defendant's track will be broken as hereinbefore indicated, but the expert witnesses for the defendant do not go so far as to say the irregularity to be produced will endanger passengers or inflict upon them any discomfort of any consequence. Robert Hazlett, engineer of the defendant company, does say, "It would make a very bad piece of track, and the worse condition the track is in the more severe it is on the rolling stock aside from any discomfort the passengers would be put to in riding over a bump like that;" but he was then speaking of the crossing as first proposed, involving an elevation of the north rail of the steam railroad track to the extent of five inches above the south rail instead of one inch, the maximum difference allowed by the decree. It is significant that he fails to say passengers would be actually endangered or seriously discomforted by a difference five times as great as that allowed. For anything appearing in the testiomny, the cars will be easily propeled over the crossing, and, in the absence of negligence, without danger of derailment or any heavy jolting. The criticisms of the expert witnesses are, for the most part, such as apply to all grade crossings. They

condemn them as increasing danger and causing delay; but, as we have seen, they are allowed by the statute, which also fails to declare any preference for other kinds of crossings. Some obstructions to view as the crossing is approached are referred to as increasing the ordinary dangers incident to a crossing at grade, but the court, in its decree, makes provision for this, by requiring the plaintiff to keep a watchman stationed at the crossing.

On the whole, no reason for disturbing the decree is perceived. The construction, required by it, is the best that is possible under the circumstances. The curve in the track of the steam railroad at the point of crossing, and the obliquity of the crossing of the tracks, which occasion the irregularity in the track of the electric road, are unavoidable; but they do not make an unusually dangerous crossing, if, indeed, they add anything to the danger of a crossing at grade, and the cost of an overgrade crossing would be comparatively very heavy. Our legislative policy encourages the construction and operation of railroads as necessary agencies of internal improvement, promotive of the development of material wealth, industry and commerce, and conducive to the convenience, comfort and well being of the people. Therefore, when it is practicable to make a reasonably safe and convenient crossing at grade at small cost, this policy would be infringed and trenched upon by refusing a demand for it because it is possible to make an over-grade, or under-grade, crossing at a cost so great as to practically prevent the building of the road. "The courts everywhere justly hold that the organization of these corporations is favored and encouraged by the legislature. *  *  *  *  In no state or country is there greater necessity or reason for railroad building and extension than in the State of West Virginia." *Deepwater Railway Co.* v. *Lambert et al,* 46 S. E. 144. Obviously, the authority conferred upon the court is administrative, as much as judicial, and intended to aid and safe-guard the exercise of the power of eminent domain, to the end that the public welfare may be subserved by enabling railroad construction to proceed wherever it may be safely, conveniently and economically carried on, as well as to prevent the unnecessary injury which might result from allowing either party to determine the kind of crossing to be made. Legislative power is no doubt ample to require over-grade, or under-grade,

crossings, wherever practicable, but until it does so, the courts have no power to read such a discrimination into the statute. The public good, rather than the interests of existing railroad companies, is the controlling factor, and the courts are bound to act in harmony with the legislative declaration of policy and judgment as to what will best subserve the public interests.

A question extensively debated in the trial court, is whether the party desiring the crossing may make choice of the location and kind of crossing, leaving it to the court to say only upon what conditions, other than the payment of compensation, it shall be made. We think the court properly ruled that the crossing to be decreed must be determined by the case made and not by the choice or will of the plaintiff. This is in perfect accord with the observations hereinbefore made, concerning the nature of the subject matter of the statute and the power conferred upon the court in respect to it.

Whether the power vested in the circuit court is to any extent discretionary, is not involved here, as the decree, viewed from any reasonable standpoint, is correct. The statute authorizes a decree for "any proper crossing." May there be more than one such crossing at a given point? If so, is the exercise of discretion by the court, in adopting one out of several, reviewable, except in cases of abuse of discretionary power? But, viewing the power vested in the circuit courts as an important *quasi* administrative or legislative, rather than a purely judicial, jurisdiction, ought not the exercise of it by these courts to be reviewable as their decisions are in all cases in which they affect matters of right?

A cross assignment of error is grounded upon the action of the court in decreeing costs against the plaintiff. As to costs, the statute under which the suit was brought is silent. The provisions of chapter 42, concerning costs in condemnation cases, have no application, for this suit is not under that statute. Therefore, if the plaintiff can have costs at all, the general statute on the subject of costs must apply, and, under it, the court must decree costs to the party substantially prevailing. Who is that party in this instance? The plaintiff obtains a crossing, the thing demanded by the bill, if it be regarded as a general demand, but not the exact crossing it sought, for the court substantially modified the character of construction proposed by the plaintiff. Instead of allowing a difference of five inches in ele-

vation between the inner and outer rails of the steam railroad track at the point of intersection, the decree prescribed a difference of not more than one inch, which will reduce the speed on plaintiff's road at that point from about twenty-one miles per hour to about eight. Ought not the plaintiff, to entitle itself to a decree for costs, be required to demand of the defendant, before suit, such a crossing as the court will decree? The ascertainment of the proper crossing in each case requires labor and expense, and, as between the parties, this labor and money is expended for the sole benefit of the plaintiff. Each case involves, and is practically determined by, the application of the principles of science so thoroughly developed that competent men will scarcely ever seriously disagree as to what crossing ought, under all the circumstances, to be made, when acting under correct information and knowledge as to the legal rights of the parties. It may be urged that the defendant, by basing its refusal to agree and its defense in this suit, upon false conceptions of the law and of its legal rights, necessitated the bringing of this suit, and, for that reason, ought to be subjected to costs. But, if the plaitniff is itself in fault, under a proper determination of the rights of the parties, its fault is not excused by that of the defendant. We must look for the immediate and legal cause of litigation, not a remote cause or moral delinquency. To require the plaintiff to demand, before suing, such a crossing as the court will allow, will compel such a complete investigation and such skill and care in the selection of the crossing for which suit is brought, as ought to precede any decree, and the party to be specially benefited by the decree should bear the expense. The obvious purpose of the legislature in giving the remedy afforded by section 11 of chapter 52 of the Code, is to prevent the making of haphazard, accidental, ill-considered and unskillful crossings, and this ruling is, therefore, in harmony with the spirit of said section. It also accords with the law, governing costs. An action brought for a debt before it is due must fail. No costs can be had after a tender of the amount due, although there may be a judgment for the debt. A demand for a crossing must precede the suit. Can the party of whom it is demanded be expected to assent to it, if it is not a proper one? Whether in any such case, costs may be decreed to the plaintiff, we do not say. The point does not arise.

Seeing no error in the decree, we affirm it.     *Affirmed.*