# CHARLESTON

Burkheimer v. National Mutual B. & L. Association.

Submitted January 31, 1906.   Decided March 6, 1906.

59 209
h 60 270

59   209
d63  357

1. Building and Loan Associations—*Dues--.Maturing Stock---Dissolution of Contract.*

    Suspension, by a building and loan association, of the payment of dues on its stock by its members, for an unreasonable time, so as to work a material departure from its general plan and scheme of satisfying loans, made to its members, of the ultimate value of their shares of stock, by maturing the stock, affords ground for dissolution of the contractual relations existing between it and a member to whom such loan has been made.   (p. 213.)

2. Building and Loan Associations---*Dissolution of Contract---Amendment to By-Laws.*

    A borrower is not estopped from demanding such dissolution, under such circumstances, by his having voted for an amendment to the by-laws of the association, conferring upon its directors power to suspend payment of dues.   (p. 216.)

3. Same---*Mismanagement--- Withdrawal of Borrowing Member.*

    When, by reason of gross mismanagement of a building and loan association, a member, who has borrowed from it the ultimate value of the stock subscribed by him, has the right to sever his relations with it, and elects to do so, he is to be charged with the amount of the loan and legal interest thereon from the date on which he received the money, and credited with the interest and premium paid, until the date on which his right to withdraw accrued, and the value of his stock as of said date, as nearly as the same can be ascertained, making due deductions for his share of the expenses and losses sustained up to that date; and, on the balance thus found to be due from him, he is to be charged with interest and credited with all payments thereafter made by him, whether on account of dues, interest or premium; and, in applying credits, before, on and after said date, the rule governing partial payments is to be observed and followed.   (p. 217.)

4. Same---*Premiums*

    A building and loan association contract of loan, stipulating for the payment of a monthly premium, limited to a certain number of payments, is not violative of the provisions of section 26 of chapter 54 of the Code of 1899, relating to the premium in such contracts.   (p. 211.)

5. Foreign Building and Loan Associations---*Right to Transact Business in this State*

    Failure of a foreign building and loan association to comply with

the provisions of section 30 of chapter 54 of the Code of 1899, does not preclude it from transacting business in this State.   (p. 211.)

6.   BILL IN CHANCERY—*Allegations—Answer*.

An allegation in a bill, which, by reason of its vagueness and uncertainty, fails to show materiality of its subject-matter, need not be answered.   (p. 211.)

Appeal from Circuit Court, Cabell County.

Suit by Wm. M. Burkheimer, Jr., against The National Mutual Building and Loan Association of New York *et al.* From a decree fixing the amount owing from the plaintiff to defendant Building and Loan Association, said association appeals.

*Reversed.*

WYATT & GRAHAM, for appellant.
SIMMS & ENSLOW and L. D. ISBELL, for appellee.

POFFENBARGER, JUDGE :

On a bill in equity, filed by William M. Burkheimer, Jr., against the National Mutual Building and Loan Association, of New York, for a settlement and adjudication of the amount due on the loan made by said association to him, on the basis of a simple, straight loan, by application to the debt of all sums paid as dues, interest and premiums, under the rule of partial payments, on the theory that the contract between the plaintiff and said association never was a legal building and loan association contract, or, if it ever was such, that, by misconduct on the part of the association, or departure from its plan, the contract has ceased to be a building and loan association contract, and for the cancellation of the deed of trust by which payment of the loan is secured, the circuit court of Cabell county adjudged and decreed, in conformity with the prayer of the bill, that there was due said association the sum of $1.50, which amount, with interest thereon from the date of the decree, was decreed in its favor, and it has appealed, claiming a much larger amount.

In *Thompson* v. *National Mutual Building and Loan Association*, 57 W. Va. 551, (50 S. E. 756), the validity of the contracts of the appellee was assailed, because of the provisions of its by-laws and form of contract, respecting payment of the premium, and an effort was made to defeat the enforcement of its contract, under the principles announced by this

Court in *Gray* v. *Baltimore Building and Loan Association*, 48 W. Va. 164, *Floyd* v. *Loan and Investment Co.*, 49 W. Va. 327, and other similar cases. But, on examination of the contract, this Court concluded that, as the premium stipulated for was not payable indefinitely and until maturity of the stock, as in the other contracts, held to be usurious for that reason, but was limited to ninety-six payments, it was sufficiently definite and certain, being a fixed premium payable in instalments, and, therefore, was not violative of the building and loan statute of this State. This ground of invalidity, though set up in the bill, is not relied upon here.

Failure of the appellee to record, in the secretary of state's office, its articles of association and by-laws, as required by section 30 of chapter 54 of the Code, is alleged as ground for holding the contract invalid, on the theory that the appellee has not acquired the right to do business in this State as a building and loan association. In *Thompson* v. *National Mutual Building and Loan Association*, cited, this precise question was raised and it was expressly held, on principles announced in *Toledo Tie & Lumber Co.* v. *Thomas*, 33 W. Va. 566, that such failure did not deprive the corporation of the right to do business in the state as a building and loan association. No reason is perceived why, in respect to this requirement, a building and loan association should be regarded as standing otherwise than as other foreign corporations. It is not the purpose of this statute to discriminate between foreign corporations on the ground of their character or the nature of their business. It has no special application to building and loan associations. It is a general statutory regulation, applicable to all foreign corporations; not denying to them the right to do business in the State, but subjecting them to fines and penalties for non-compliance therewith.

Another ground of attack is failure of the association to comply with the laws of the State of New York. Just what is meant by this allegation is not very clear. It is both general and uncertain. It reads as follows: "The plaintiff now, however, alleges and charges that said Association has not complied with the statutory requirements of the State of New York so as to permit said Association to come within the benefits granted by the statute of the State of New York to Building & Loan Associations, but that it has failed to prop-

erly file and record its articles of Association as provided by the laws of the State of New York, which is a prerequisite before it is permitted to do business as such Building & Loan Association in the State of West Virginia.'' It is not alleged that there has been a failure to file and record the articles of association, but only that they have not been properly filed and recorded. The bill does not charge that any law of the State of New York requires articles of association to be filed and recorded as a pre-requisite to the right to do business, as a building and loan association in the State of New York, or, to the right of a New York building and loan association to transact business in another state, but only that it is a pre-requisite to the right to do business as a building and loan association in the State of West Virginia. No statute of this State, so far as we are able to see, denies to a foreign corporation the right to do business here because of failure to strictly comply with every regulation prescribed by the laws of its own state. But if we had such a statute, this allegation is too indefinite and uncertain. The bill admits the corporate existence of the defendants. It is sued as such, and the only fault found with it is its failure to file and have recorded its articles of association in some office or place not specified or indicated. Where and how are they to be filed? In alleging failure to perform duty, the bill must show what that duty is. ''It may be affirmed as an elementary rule of the most extensive influence, that the bill should state the right, title, or claim of the plaintiff with accuracy and clearness; and that it should, in like manner, state the injury, or grievance, of which he complains.'' Story Eq. Pl., section 241. If it alleged that, by the laws of the State of New York, such articles of association are required to be filed in a particular office, and that they have not been so filed, then the court could look to the laws of that state as evidence, to sustain the allegation, and the defendant would be apprised of what is relied upon as a failure of duty, working fatal infirmity in its organization or contract. Can it be forced by such a general allegation to produce evidence of strict and full compliance with every statutory provision of the laws of New York, relating to corporations? How can it know whether the omitted act is material without an indication as to what it is? Some statutes are mandatory and some direc-

tory.   What is the character of the one which is said to have
been violated?   How can anybody tell?   The opposite party
is entitled to notice.   He is not required to respond to a drag-
net allegation.   Certainty is one of the essentials of pleading.
Story's Eq. Pl., sections 28, 240, 241; *Wellsburg &c. R. R.
Co.* v. *Traction Co.*, 48 S. E. 746, 750; *Billingsley* v. *Men-
ear*, 44 W. Va. 651; *Vance Shoe Co.* v. *Haught*, 41 W. Va.
274; *Zell Guano Co.* v. *Heatherly*, 38 W. Va. 4.¹⁰; *Pyles* v.
*Furniture Co.*, 30 W. Va. 123; *Newberger* v. *Wells*, 51 W.
Va. 624, 639.   That quality is wholly wanting in so much of
the bill as relates to this matter.

A serious matter is presented, however, by the charge that
the building and loan association has practically abandoned
its whole plan and scheme, by an indefinite suspension of
dues, continued for the long period of nearly seven years, to-
wit, from the first day of June, 1898, until the 29th day of
April, 1905, when its answer was filed in this cause.   The
loan was made in 1893, from which date the plaintiff paid
dues, interest and premiums until May 31, 1898, but not reg-
ularly and promptly.   On the 20th day of April, 1898, the
by-laws of the association were amended so as to confer upon
the directors authority to suspend payment of dues on all
shares, at any time, by a two-thirds vote, for such period of
time as to them might seem best.   Under the authority thus
conferred, they did suspend payment of dues on all shares,
borrowed and unborrowed, from the first day of June, 1898,
and, so far as this record shows, have never resumed the col-
lection thereof.   But they required the payment of interest
and premium on the loan during the period of suspension
and gave to the borrowers the right to make such payments,
on account of the principal of their debts, as they might wish
to pay, and represented that there should be a consequent
reduction in the interest and premium to be collected.   Un-
der this arrangement, the plaintiff continued to pay interest
and premiums until the 17th day of July, 1900, and also to
pay money in lieu of dues until the 9th day of June, 1900,
amounting to the sum of $180.00.   He having ceased to
make further payments, the directors, on the 12th day of
June, 1900, ascertained the value of his stock to be $456.44,
applied said sum as a credit on the loan of $1,200.00, and
claimed a balance due the association on that date of $864.49.

Being of the opinion that, by the suspension of the payment of dues, the association had forfeited its right to enforce the contract as a building and loan association contract, the circuit court treated the whole transaction as an ordinary loan, giving the plaintiff credit on the debt for all sums paid.

As the contract was originally a valid one, it is difficult to see how a breach thereof on the part of the building and loan association, could make it void *ab initio*, or change its character. Up until the first day of June, 1898, the association, for anything that appears in this record, literally and strictly complied with all the terms of the contract. All payments made prior to that date were confessedly made under the contract, and under a valid contract. The effect of a breach of the contract, or failure of duty, by the association, on that date, would be, not to divest rights which had already attached, nor to undo things which had been done in conformity with the contract, but only to vest in the injured party a right of action for damages or specific performance, if he wished to stand upon his contract right, and, if he did not to demand a rescission of the contract, or settlement by way of withdrawal. These are elementary principles of law which the courts cannot disregard, however harsh their operation may be. Relief from a contract cannot be given by the courts merely because it is a hard one or an improvident one, or to punish somebody for wrong-doing. Courts of equity have large powers, it is true, but they are limited to the effectuation of equity and justice, not in disregard of contracts or contractual rights, but upon certain equitable grounds, springing out of the conduct of the parties, or fortuitous circumstances; but in all such instances they are careful not to do injustice, not to ignore vested rights and interests, and never to depart from the letter of a contract, further than is necessary to the effectuation of right and justice, as they spring out of inequitable conduct of some of the parties. Their office is not to execute vengeance or punish the wicked.

In becoming a stockholder in the association and borrower from it, the plaintiff entered into contractual relations, not only with the association as a distinct corporate entity, but with all its other members, and these may have been numerous. There were expenses to be borne, losses to be sustained and

profits anticipated.   And those who took stock, paid in their
money and borrowed money, put themselves in the same sit-
uation as the plaintiff, and have rights and equities as meri-
torious and   sacred   as   his.     He may be one of a thousand
men who stand in  practically the  same  situation.   To give
him  back all the money he has paid in by way of credit  on
the amount borrowed by him would  relieve him from  the
burden of all the expenses of the association and from lia-
bility to contribute to its losses, and, if one after another of
the stockholders and borrowers  should be permitted  thus to
withdraw, the fund  would  be  exhausted  in  a  short time.
Five hundred of the one thousand would  come out whole
while the remaining five  hundred  would  lose  everything.
The association mangement may have been corrupt or ineffi-
cient and the losses may be heavy by reason thereof.    But
can a court of equity  say  that,  because  this man has been
wrongfully treated, his  money  wasted, and squandered  by
inefficient or corrupt directors, he  shall  be  permitted  to
throw the whole loss upon his associates?    That is not the
basis of settlement adopted by this Court in the case of the
insolvency of building and  loan associations, in consequence
of which a similar state, of affairs exists.    All are required
to  contribute proportionately  to . the  loss sustained.   In
*Young* v. *Building Association*, 48  W. Va. 512, this Court
laid down the following rule, applicable to such  a situation:
"Upon the insolvency of a building association the dues paid
on stock by borrowing members are  not  to be credited on
the debts of. such members.    Upon  insolvency of a building
association, in winding up its affairs a  borrowing  member
must be charged with  his  debt and  interest, and  credited
with all moneys paid in by him except dues on stock. After
payment of debts, he gets his share of residue, in the final
distribution of what remains after payment of expenses of
winding up and debts.   If it be safe to all interests and
practicable to ascertain in the present value of the stock,
the court may, for the present relief of a borrowing mem-
ber, credit that value of his stock on his indebted-
ness, without deferring its application till the  final
value."

Whether the  plaintiff may  sever  the relations existing
between him and the association, otherwise than in the man-

ner provided by the by-laws, depends upon the nature of his contract and his conduct in reference to the matter of which he complains, namely, the suspension. At the time of the amendment of the by-laws, somebody held his proxy and voted for the amendment. Assuming that the holder of his proxy had authority to vote for an amendment so materially affecting the contract, it does not follow that the plaintiff assented to all the consequences which have resulted from that amendment. The vesting of authority in the directors to suspend the payment of dues and the suspension itself may have been entirely proper and promotive of the best interests of the association and all its stockholders, including the borrowers. That the directors should have such power may be altogether proper and wise. The possession of that power by the directors is the remote, not the immediate and direct, cause of the injury of which complaint is made. The suspension covers a long period of time, and there is no suggestion in the record of any intention or purpose to resume payment of dues. For aught that appears here, it is a permanent suspension, with a view to winding up and dissolving the corporation. It has been held that a temporary suspension affords the borrower no ground of defense against the enforcement of the obligation of his contract. *Johnson* v. *Building Association,* 104 Pa. St. 399; *Thompson* v. *Building Association,* 56 Ga. 350. But this could hardly be deemed a mere temporary suspension. The effect of it is to cause the borrower to pay a large amount of interest not contemplated at the time of entering into the contract. It also denies him the privilege of reducing his debt in the manner contemplated, postpones for years the maturity of the stock and renders it doubtful as to whether it will ever mature. The directors in this instance have not only required the borrower to pay interest on the debt, but the premium in addition thereto. These items amount to $12.00 a month, $72.00 a year, nearly $500.00 for the period of nearly seven years. This is a considerable amount of money to exact on a small transaction like this in a manner not contemplated at the inception of the contract, and there is no suggestion that there will be any cessation of it. The continuance of the business and the execution of the contract substantially, according to its terms, was expected

and relied upon by the plaintiff in entering into it.   He supposed that, at the end of the eight years, his stock would mature and thereby satisfy the debt.   In this way, he could, by small periodical payments, extending over a considerable period of time, pay what was, to him no doubt, a considerable debt, without greatly burdening himself. Twelve years have passed and, during more than. one-half of that period, there has been an abandonment of that part of the contract which it was supposed would largely contribute to the satisfaction of the debt at the end of the contemplated period.   This is material and ought to afford ground of relief.   7 Thompson on Corporations, section 8796, says:   "In return for the undertakings of the borrower in the transaction of loan or advancement as they have been pointed out, there is an implied undertaking on the part of the association scheme in the liquidation of the whole of his indebtedness; *i. e.*, that it shall be by means of gradual payment, and that he shall participate, and have the opportunity of reducing his liability by his participation, in the profits of a continuing business, to be carried on to a fixed end.   Where, through bad management, financial misfortune, loss of membership, or any other cause, the career of the association is brought to a premature close, the borrower is compellable forthwith to pay the balance due from him on his security, although in terms only given for installments.   He is, therefore, deprived of some proportion of the advantages, the prospect of which induced him to assume the burden of his original obligation.   There remains nothing to compensate him for his liability to make up the premiums, to keep up stock payments, to pay fines, etc.   The consideration of the liability failing, the liability itself must, in a proportionate degree, fail also."

As a case of dissolution or inability to carry out the contract is not here fully disclosed, what has just been quoted may not be applicable in its full extent to this case; but it asserts a principle within which the case falls.   There has been such a departure from the plan, and such an abandonment of some of its essential features for so long a time, as to deprive the borrower of a substantial part of the original consideration, in consequence of which he is entitled, upon

well settled principles of law, to a severance of his relations with the association on some equitable and just basis. Though there may be no cause for dissolving the corporation and winding up its affairs, there is ample cause for dissolving the relations subsisting between him and the corporation, just as one partner may, for cause, dissolve a co-partnership or withdraw from it, leaving it subsisting as between the other partners, if they desire to carry it on. In such case, it may be that there is a technical dissolution, since the settlement must be made on the same basis as in the case of final dissolution and distribution of all the assets. But in every practical sense, it may be a mere withdrawal by one member of the co-partnership, and no reason is perceived why such withdrawal cannot be effected in a corporation, when the circumstances warrant it. Many of the principles of co-partnership enter into the relations subsisting between the members of a corporation. On dissolution and settlement the same principles apply, except that ordinarily there is no liability for unpaid debts, and the legal title to the assets is not in the members of the corporation as it is in the members of a co-partnership. A dissolution of a partnership, for cause, puts an end to it, but its termination does not imply that it never had any existence. When the cause which gives right to a dissolution arises, it does not vitiate the contract from the beginning. On settlement it is treated as having been a valid binding obligation from the beginning until the date of dissolution.

In the application of general principles, some variation must always be made to accommodate them to the nature of the case and its peculiar circumstances. This is not a co-partnership nor is it an ordinary corporation. The borrowing stockholder sustains a dual relation to the corporation, and, through it, to his corporate associates. In one aspect he is a debtor, the amount due from him constituting part of the assets of the corporation to which its creditors may look for satisfaction of their demands and to which, after the satisfaction of the claims of creditors, payment of expenses and deduction for losses, all the stockholders, he included, may look for their distributive portions on dissolution, or consummation of the enterprise. In another aspect, he is a stockholder, contributing to the capital stock of the corporation,

along with his corporate associates, all in some form sharing the burden of expenses and the risk of losses and dividing the profits earned. But a peculiar feature of the arrangement is that each borrowing member hopes and expects that his stock, with the profits earned, will ultimately pay the debt he owes. Each borrower pays an enormously high rate of interest, but knows that every other borrower is doing the same thing and that their money kept continually loaned at a high rate of interest, collected weekly or monthly and re-loaned and thus compounded, will produce large profits to the association to be apportioned to the stockholders as additions to the stock values, thus accelerating and hastening the maturity of the stock and consequent payment of the debt. The statute allows such collection of interest for the very reason that the borrower profits by the arrangement. It hastens the day of maturity of the stock and comes back to each stockholder in proportion to the amount of his stock. Though not the ordinary legal rate of interest, it is a lawful rate which the law permits the members of building and loan associations to establish among themselves for their mutual benefit.

Upon these considerations, it might be just and fair to give the association the benefit of the premiums paid, or which ought to have been paid up to the date of the suspension, and allow the borrower to take, as a credit on his debt, the full actual value of his stock at that date. But he agreed to pay that premium as a consideration for the opportunity given him to satisfy the loan by maturing the stock within the time contemplated. He did not agree to pay, as premium, fifty cents per share for such length of time as the association might be solvent or properly conduct its business, but for the whole period of eight years, as consideration for the satisfaction by the association of his debt at or near the end of that period by maturing the stock. The premium is not, in a legal sense, additional interest, though it practically amounts to that. Legally, it is the purchase money of the right to take from the association as a loan the ultimate value of the borrower's stock to be paid and satisfied by the maturing of that stock. When the association becomes insolvent, or, by its misconduct, makes it necessary or proper for the borrower to dissolve his relations with it, the consideration for the

agreement to pay that premium fails and the borrower may elect to withhold it, and to claim, as a credit on his debt, such portion of it as has been paid. In some jurisdictions, the premium is apportioned, according to the time which has elapsed, such part of the premium as is proportionate to that time being called the "earned premium" and the residue the "unearned premium." In other jurisdictions, the reasonable view of a total failure of the consideration for the premium is adopted and the borrower is allowed credit for all the premium paid. This Court, in *Young* v. *Building Association*, followed that line of decisions which allows the borrower credit for all the premiums paid. Here, inasmuch as the borrower has shown himself to be entitled to go out of the association, not by way of withdrawal, in the manner prescribed by the by-laws, but as of right, as is the case of a dissolution, the same principle ought to be applied.

Endlich on Building Associations, after reviewing the decisions in the different states, says, at section 531: "Upon the basis of all the decisions examined, it may be safely laid down that the clear weight of authority rejects the enforcement of any part of the premium. And in reason and fairness this must be so. The premium is not a payment in advance. The contract concerning it is that it shall be made up by the borrower in the association's hands, and that, upon his final settlement with the association, when the work of both shall be accomplished and their reciprocal duties fulfilled, it shall be relinquished to and appropriated by the association. The contract, therefore, is an entire one. It does not contemplate a stoppage at any intermediate point and an apportionment of the premium accordingly. No part of it is earned until the whole scheme has been carried out. Hence, if at any stage, the society, breaking down, fails to perform its part of the bargain, the promise to pay it the premium loses the consideration upon which it was based, and ought to be regarded as wholly abrogated. To attempt to apportion the premium is simply to treat it as additional interest. To regard it as something with which the borrower has parted, as something which the society has earned, as assets in its hands before it has done that which entitles it to retain the premium, is to misconceive its true character and office. It must be true, therefore, that the basis of the borrower's in-

debtedness is to be taken to be the amount of money actually passing into his hands with legal interest thereon. But it cannot be true that he is to be allowed as deductions therefrom all that he has paid into the society. That would be overlooking his duty as a member to contribute to the losses and expenses of the common enterprise. What he has paid as interest is to be allowed him as paid upon interest. If he has paid interest upon the premium bid by him, he has overpaid his interest, and the excess ought to go in reduction of his debt. * * * * When a building association's affairs are in the hands of a receiver, acting under the direction and supervision of a court of equity, there can be no difficulty in determining or, at least, approximating what its receipts, profits and losses have been, what its liabilities are, and what is the value of every share of stock presently held advanced or unadvanced in it, and how much every member must lose upon every dollar paid in by him upon his stock, making a proper allowance for the expenses of settlement. If that can be ascertained, the amount per share to be credited upon the borrower's indebtedness, that is, upon the amount actually received by him originally, has been found, and if he pays the balance with interest (being credited with interest payments) he has discharged all he owes the society or his fellow members. If these preliminary calculations can be made to yield only an approximately correct result, a corresponding credit ought to be allowed for the borrower's stock and his right preserved to reclaim what, on a final settlement, he shall appear to have overpaid."

This law seems to be justly and fairly applicable to the present case, but at what time ought the application of it to be made? Since June 1, 1898, nothing appears to have been done but receiving interest and premium on the loans and collecting assets. The plaintiff has not paid nor been permitted to pay, any dues, and it seems to be admitted that none had been paid by any person. He has made payments corresponding in amount to the dues, but with the understanding that these payments were to be credited upon his debt. Hence, it appears that there has been a cessation since June 1, 1898, of some of the most important functions of the association. What disposition has been made of the collections does not appear. Whether they have been re-loaned

and profits made or have been consumed in the payment of withdrawals, nothing in the record indicates. It is fair to presume that, had the association regained its normal and healthy condition, this state of affairs would not exist. It would be exercising all its functions and working towards maturity of the stock. Something must still be radically, and perhaps incurably, wrong. All this argues that such was the condition at the date of the suspension. The logic of the situation and circumstances disclosed by the record is that a process of liquidation has been carried on for all these years by the directors. Hence, the adjustment between the plaintiff and defendant ought to be made as of June 1, 1898. He should be charged with the amount of the loan and interest thereon from the time at which it was received, and all payments made by him, as interest and premium, should be credited and applied on the debt and interest thereon, according to the rule governing partial payments, and the actual value of his stock, as nearly as it can be ascertained, as of June 1, 1898, should be credited also. Then, starting with the balance thus ascertained, he should be charged with interest thereon and credited with all payments of premium, interest and dues, or sums paid in lieu of dues, under the rule governing partial payments, and required to pay the amount remaining due as thus ascertained, and, upon the payment of said amount, the association should be required to execute a release of the deed of trust. How far the result, so to be determined, will differ from that at which the court below arrived, in treating the loan as an ordinary one, depends largely upon the value of the stock. The dues paid up to June 1, 1898, amounted to $388.80, but it seems that several payments were omitted, in consequence of which the value of the stock at that date would probably be considerably less than that of other shares, the dues on which were kept promptly paid. The incompleteness of the record, respecting the status and value of the stock at the time aforesaid, may render it necessary to conduct an inquiry in respect thereto. It may also appear, upon full investigation and disclosure of all the facts, that credit for the full book value of the stock on that date would not be equitable and just. Therefore, the matter of what should be credited, as the value of the stock at the time afore-

said, will be left open for determination by the circuit court upon ascertainment of the necessary facts.

For the reasons above given,. the decree complained of will be reversed and the cause remanded for further proceedings, in accordance with the views herein expressed, and the principles and rules governing courts of equity.

*Reversed.*

Sanders, Judge, (*dissenting:*)

The decree of the circuit court is based upon the theory that at the time the defendant became a member of the association and at the time the loan was made to him, certain by-laws of the association were in force, providing that monthly dues should be collected from all members and stockholders of the association, and that some time thereafter the by-laws were changed so as to permit the directors to indefinitely suspend the payment of such dues, which they did, in pursuance thereto, thereby changing the contract entered into between the plaintiff and the association, and defeating the entire purpose and object thereof, and destroying its features as a building and loan association, and that this being done, the loan made should be treated as a simple loan, bearing the legal rate of interest. This conclusion of the circuit court, I think, is eminently correct, and I would affirm the decree.

The conclusion reached by the Court, in its majority opinion, and that reached by the circuit court, differs only in respect to the basis of settlement, it being held here that the indefinite suspension of dues amounted practically to a dissolution of the association, and that the settlement should be governed by the principles announced in the case of *Young* v. *Building Association*, 48 W. Va. 512. It does not appear from the record that the association, at the time of the suspension of the payment of dues, was insolvent, or that it is now insolvent, or has been disssolved, nor is there any such claim, but, so far as the record shows it is perfectly solvent and continuing. Therefore, it is improper to hold that the settlement made with the plaintiff should be upon the theory that the association is not a going concern. So far as we know, this plaintiff is the only member complaining of such suspension, and the only one who seeks a settlement

and desires to withdraw. This being so, the question arises, must he be required to fulfill the contract on his part by paying dues upon his stock until the time of such suspension? The association, by the indefinite suspension of dues, has entirely changed the contract of the plaintiff, by necessarily extending the maturity of his stock to a time far beyond that at which it would have matured if the contract had been carried out as entered into, and had been continued upon the plan and scheme of a building and loan association. This being so, the plaintiff should only be required to repay to the association the amount of the loan, with six per cent. interest, giving him credit upon the plan of partial payments for all payments he has made. It is said that he should be required to pay dues up to the time of the suspension, because to hold otherwise would be a hardship on the other stockholders and members of the association. Why is this so? He repays to the association the sum of money which it advanced to him, as a loan, with six per cent. interest. It is in no worse condition. The money that it advanced has been repaid, with its legal interest. When the plaintiff entered into his contract, the by-laws of the association entered into and formed a part of it, and these provided for the payment of dues, premium and interest in monthly installments until the maturity of the stock, but premium not to exceed eight years. By this plan there was a chance that the association, if its affairs were honestly administered, would mature its stock, within this term, from the earnings of the company. This the suspension of dues effectually prevents. The association disabled itself to perform its contract. It does not appear from the record but that the other stockholders have assented to and acquiesced in the change. The plaintiff cannot be bound by their acquiescence, nor is he required to contribute to the support of the association the dues paid by him to the time of the change, on the assumption that to hold otherwise would be a hardship on the other, and, so far as we know, assenting stockholders. The consideration for his contract has failed absolutely, and he has the right to treat it as abrogated, which he has done. This being so, nothing more should be required of him than the interest on the money received, but that, together with the principal, he should pay.