### ELKINS ELECTRIC RY. CO. v. WESTERN MARYLAND R. CO. et al.

(Circuit Court, N. D. West Virginia. August 29, 1908.)

1. EMINENT DOMAIN—PROPERTY SUBJECT TO APPROPRIATION—RAILROAD RIGHT OF WAY—USE BY ANOTHER COMPANY.

   Under the law of West Virginia, the right of way of a railroad company is its private property; the rights of the public therein being only in its use. After it has acquired and is using such right of way for its road, it cannot be wholly deprived thereof for any other public use, nor can it be subjected to the burden of a further easement thereon without compensation.

2. RAILROADS — RIGHT OF CROSSING ROAD OF ANOTHER COMPANY — WEST VIRGINIA STATUTE.

   Code W. Va. 1906, § 2343, cl. 7, authorizes a railroad company "to cross at grade or to cross over or under * * * any other railroad * * * at any point on its route," and provides that, if the two corporations cannot agree upon the amount of compensation or the points and manner of such crossing and connections, the same shall be ascertained and determined by condemnation proceedings. Section 2216 provides that any railroad, canal, or pipe line company, etc., may cross any other railroad, canal, or pipe line at grade, "provided its work be so constructed as not to impede the passage or transportation of persons or property along the same"; that, "in case the parties interested fail to agree upon such crossing, * * * the company desiring it may bring its suit in equity, and in such suit the court may in a proper case decree that such or any proper crossing * * * may be made upon payment of damages," to be ascertained by proceedings under the condemnation statute. *Held* that, construing such provisions together and in the light of other provisions, a railroad company has not the absolute right to cross the road of another company at grade at any point it might select, but that, if the parties could not agree on the same, the point and manner of the crossing must first be determined by the court in a suit in equity, after which the crossing may be made on payment of compensation to be determined in condemnation proceedings.

In Equity. On intervening petition of the Elkins Electric Railway Company.

By regular proceedings had in a suit instituted by the Bowling Green Trust Company against the Western Maryland Railroad Company in the Circuit Court of the United States for the District of Maryland, and in an ancillary proceeding instituted by the same plaintiff against this railroad company in this court, Benjamin F. Bush has been appointed receiver for the Western Maryland Railroad Company, and the affairs of the company since March last have been administered under the direction of these courts in the two proceedings. In the order appointing the receiver and clothing him 'with authority to administer the affairs of the railroad company, an injunction was awarded against all persons, restraining them from in any manner interfering with the control, management, and operation of the railroad by the receiver. On March 27, 1908, the receiver filed his petition in this court, setting forth, in substance, that the Elkins Electric Railway Company had so interfered, in violation of the terms of the injunction order, with the corporate powers of the Western Maryland Railroad, and had committed trespasses by construction of its railway on a portion of the lands and right of way of the railroad company without permission, license, or authority either by law or from the Western Maryland Railroad Company prior to the appointment of the receiver, or from the receiver since his appointment, and that such trespasses interfered with the proper management of the railroad company's property, and that the electric railway company had upon the grounds instruments and appliances, and was threatening to unlawfully place a grade crossing at the point of trespass, which, if constructed, would seriously interfere with the property intrusted to the receiver, and a rule was asked in said petition against the Elkins Electric Railway Company, its manager, J. E. Morgan, and its engineer, P. B. Bloomfield, to show cause why they should not be attached for their contempt in disobeying the injunction order. This rule was awarded, and on April 4, 1908, the electric railway company, Morgan, its general manager, and Bloomfield, its engineer, appeared and filed their answer thereto, in which they deny that they have been guilty of any contempt of this court in any way or manner whatsoever; that they have in any manner obstructed the railroad of the Western Maryland Railroad Company, or Bush, its receiver, in the discharge of his duties as such, and they deny that they have violated the injunction order issued, or that they have constructed the grade of the electric railway over the lands of the railroad company or upon the right of way of the railroad company, or in any way have committed any actual trespass upon the lands of the railroad company, and in minute detail set forth the facts as they understand them to be. To this answer Bush, receiver, reserved the right to except or reply, and on motion of the Elkins Electric Railway Company leave was given it to file its petition in the cause at any time within ten days from that date, making necessary parties thereto, and by such petition present such allegations as would enable this court to determine its right to have the crossing brought into controversy in this cause, and leave to sue out process on said petition was also given. On April 13, 1908, the Elkins Electric Railway Company filed this petition, in which it sets forth that it is a corporation under the laws of West Virginia, with its principal office and place of business in Elkins, Randolph county, said state; that under its charter it has the right to build and operate an electric railway on a large number of the streets of the city of Elkins, and to connect the city of Elkins by an electric railway line with the city of Belington, in Barbour county, said state; that it is actively engaged in the construction of its line of railway, and has completed its roadbed to a considerable extent, set forth in said petition, in the city of Elkins, that this roadbed is completed to within a few feet of the right of way of the Western Maryland Railroad on Randolph avenue on the eastern side and on the western side for the entire length of Harrison avenue to the corporate limits of the city of Elkins, having in all about 1½ miles of continuous trackway, excepting only the gap therein of a few feet across the Western Maryland Railroad, and, in addition to this, that it has practically completed the grading from the corporate limits of Elkins to the gap of the mountain down the river below Elkins toward Belington, and is engaged in accomplishing the grading of the line between the two cities. It is further alleged that, by the grants of its charter, it has the right to acquire all neces-

sary rights of way' for its line either by gift, condemnation, or otherwise, and has the right to acquire the right to cross the right of way and tracks of the Western Maryland Railroad Company at the intersection of Randolph, Railroad, and Harrison avenues in Elkins. The petition then sets forth the power of Benjamin F. Bush, as receiver under the order of this court, to operate the part of the railroad situate in West Virginia; that petitioner has had negotiations with proper officers of the Western Maryland Railroad Company before it went into the hands of the receiver with a view to secure an amicable agreement relative to said crossing, but no such amicable arrangement could be made and was about to institute condemnation proceedings in the state court when said receiver was' appointed; that petitioner took up said matter with the receiver, but he utterly refused to entertain any reasonable proposition, having for its object the acquisition of the right to cross the railroad tracks or right of way; and that, therefore, it is necessary to apply to this court to secure the same. The petition then charges that it is imperatively necessary for it to have the right to cross at grade at the point indicated; that the crossing is absolutely necessary; that a crossing below or above grade would be wholly impracticable at said point; that there is no other point that would be practicable for petitioner to cross the tracks at grade or under grade so as to meet the necessity and requirements of petitioner and its line of railway; that it is entirely practicable to have the crossing at that point; that petitioner has obtained from the city of Elkins the right to use Randolph, Harrison, and Railroad avenues for the purpose of constructing and operating its railway thereon.

Additional charges are made touching the obligation of petitioner under its contract with the city of Elkins to do certain paving upon certain avenues, which it alleges it has done, and the other fact, that at the point where the crossing is sought the railroad crosses the old turnpike, which was retained by the city as parts of said avenues, and that it is not believed that the railroad company or its predecessor, the West Virginia Central & Pittsburgh Railroad Company, acquired a right to cross the turnpike at said point, and that it is a trespasser upon the turnpike and has no legal right to be thereon, except it has the right by prescription and sufferance. It is then charged that, under the laws of West Virginia, it has equal rights with the railroad company to the use of said crossing, and that it will engage chiefly in the transportation of passengers for hire and has a greater interest than the Western Maryland Railroad Company in seeing to it that the crossing be properly constructed and kept in safe condition because it will cross the same with its cars carrying passengers at very brief intervals, while the railroad company will only pass over this crossing about four times each day with its trains carrying passengers, but that it is true the railroad company has and will possibly continue to have a large number of freight cars passing over the crossing every day, possibly as many as 10 trains of freight cars; that petitioner desires to place as well-constructed railroad crossing at the point as can be procured, and now has the same ready to place, and the same is known as a "90-pound triple railroad crossing"; that petitioner is under heavy bond with stringent conditions to have its electric railway in operation, in good faith, in Elkins by not later than the 15th day of October, 1908, and to refuse it the right to cross the tracks of the Western Maryland Railroad at this point will cause it grievous inconvenience and great financial loss. It is then averred that under section 11 of chapter 52 of the Code of West Virginia, as amended by chapter 43, p. 228, Acts W. Va. 1907, it is proper in all cases similar to this, where it is desired to cross one railroad at grade by another, to apply to a court of equity by proper bill of complaint to have fixed, and determined the place, proper connection, terms, and condition upon which the crossing may be made and the prayer of the petition is that this may be done. With the petition is filed exhibits showing the charter and amended charter of petitioner, and a map or survey showing the crossing sought. To this petition demurrers were filed by the Bowling Green Trust Company, Bush, receiver, and the Western Maryland Railroad Company, all relying on three grounds: First, that no leave or permission had been obtained by the petitioner to intervene; second, that petition did not sufficiently set out the plan, method and necessary particulars of the crossing; and, third, that no relief by way of condemnation is prayed for in said petition.

On the 5th day of June, 1908, these demurrers were considered by the court and overruled, and Bush, receiver, the Bowling Green Trust Company, and the Western Maryland Railroad Company, filed their separate answers, to which the petitioner replied generally. And the court, being of the opinion that the hearing of the cause could be expedited by so doing, directed that Patrick Cain, P. B. Bloomfield, and C. McC. Lemley, civil engineers, should go upon the ground where the crossing in controversy was located and ascertain and report whether or not such crossing was necessary, and whether or not it was practicable to establish it at that point and upon what terms and consideration the same should be established, and the amount of damages which in their opinion would be sustained by the establishment of the crossing and the terms and conditions upon which the electric railway company should be permitted to have a crossing at that point; also, that they should examine any other point or places that either of the parties might designate as a place where the electric railway company might cross the tracks either at grade, under grade or above grade, and report the advantage and disadvantage of such place or places of crossing, together with all the facts and circumstances connected therewith necessary to enable the court to determine the advisability of adopting such crossing, and, the defendants having demanded the right to take proof in support of the allegations of their answer, the court further gave said petitioner 15 days in which to take such proper proof as it might desire to take in support of the allegations of its petition, requiring notice to be given 5 days before of the time and place of taking the same, and then giving to the defendants 20 days thereafter in which to take its proof, and directing that such proof be taken in the form of depositions.

The answers filed to this petition by the defendants the Bowling Green Trust Company and the Western Maryland Railroad Company adopt substantially the averments made by the defendant Bush, receiver, in his answer thereto. This answer of Bush, receiver, very fully and minutely sets forth the objections made to the crossing at the point desired by the electric railway company. It avers that this point is where several avenues join; that it is substantially in front of a deep cut and curve in the railroad where its two tracks emerge into the yards of the railroad company at Elkins; that the crossing would be very near the switch entrances leading to the scales and to the repair shops of the railroad company, and it is charged that the crossing is impracticable, would be unusually dangerous, and exceedingly expensive. It denies that it is the only available crossing, but, on the contrary, sets forth, in substance, that at First street in the city of Elkins the track of the railroad company crosses the street above grade at a sufficient height to allow the electric railway to pass under its said track, and that the railway company has from the city the right to use this First street and other streets on the westerly side of said railroad tracks sufficient and suitable to connect up its line with Harrison avenue. It charges that, long before the railroad company went into the hands of the receiver, it had positively refused and denied the right to cross at the point desired, but had agreed to give free right of way under its property for the undergrade crossing at First street, and the receiver by his answer tenders to the electric railway company, free of cost, this undergrade crossing. It denies the construction insisted upon by the electric railway company of the West Virginia statute, and insists that under this statute a court of equity may only decree what is a proper crossing to be made under all the circumstances, and may locate the crossing or select between several proposed crossings and allow one of the same.

On July 6, 1908, the commission of civil engineers filed their report in this case. This commission was composed of Patrick Cain, engineer for the Western Maryland Railroad Company, P. B. Bloomfield, engineer for the Elkins Electric Railway Company, and C. McC. Lemley, a civil engineer in no way connected with either of the roads and selected by the court. In their report these engineers disagree. Cain and Lemley reported that, under existing conditions, a grade crossing at the point desired by the electric railway company would be impracticable, and, if allowed, would entail an unnecessary burden and expense upon both the railroad and the electric railway companies, and especially to the former for the reason that such crossing would be over two tracks in the throat or entrance to the yard of the railroad company, on a heavy grade coming into the yards and against the traffic pulling out of the yards, very dangerous to the trains coming down the grade to the depot, on

account of a short curve just east of the crossing through a deep cut, preventing sight of any obstruction on the crossing until within about three hundred and fifty feet of it. It is set forth in this report that this yard takes care of the classification of all freight coming to Elkins from the Coal & Coke, Coal & Iron and the Western Maryland Railroads; that the proposed crossing would be only a few feet, probably 15, from the point of the switches leading into the yards, and about 350 or 400 feet from the track to the scales upon which the cars are weighed; that the crossing would be located at a point over which the shifting of cars would be absolutely necessary in order to make up trains and ascertain the weight of car load shipments; that four public highways join at this crossing, as well as two private driveways; that over it is the only outlet or inlet for the railroad company to reach their repair shops, coach sheds, and that the crossing of the electric railway company at this point would increase danger to the public highways, inflict additional hardship and continual expense upon both companies and the public, create delays to the railroad and danger of accidents to the public. It is further set forth in the majority report that the installation of such crossing should be estimated at $2,374; that the cost of two watchmen and maintenance should be estimated at $900; that delay to freight trains required by law and by reason of the grade and inability of such trains being able to start after being stopped would be $2,860 per year, which sums being capitalized at 5 per cent: would make a total of $124,640. Bloomfield reports that this grade crossing is necessary and would be practicable; that the crossing as asked for should be installed at the cost and expense of the Elkins Electric Railway Company under specifications and supervision of the Western Maryland Railroad Company; that, if obliged to have a signal system, the Elkins Electric Railway Company should be willing to bear half the expense, for which system and all such other expenses necessary to operate and maintain such crossing he does not consider that any damages should be awarded the Western Maryland Railroad Company, on account at least of the operation of their railway caused by the crossing, and he thinks the railroad company should bear half the expense of the crossing and of the signal system.

Touching the undergrade crossing on First street, Cain and Lemley report that the same could be made; that the Western Maryland Railroad Company's tracks now cross First street above grade, giving about 10½ feet clearance at the highest point in the street, and by excavation of 4 feet can give 14½ feet clearance, which would be sufficient clearance to take the electric company's cars under the bridge, and that further clearance could be gotten by excavating deeper, or by putting an additional bent or a more shallow girder in place of the one now used by the Western Maryland Railroad Company over First street. They report that this crossing would probably be covered by high water a few times a year, but that it would be seven feet (which is considered ordinary high water mark) above low water, with a clearance of 14½ feet, and, as the water soon falls, there could be no serious objection to this, as most railroads are in low lands along rivers below high water mark, and oftentimes out of commission by reason of water and floods; that this undergrade crossing would have a material advantage over the grade crossing from the fact that it would eliminate all danger to the public traveling on either line of railway in so far as accidents are concerned; that it would eliminate all delays to traffic on both lines which are unavoidable on grade crossings; that, while it would change the route of the electric railway somewhat and cause the building of about four thousand feet of track, it would take the electric railway over a practical route; that a portion from Third street to First street on Davis avenue, which they would no doubt use at some time to reach the fair grounds could be used now in getting to this crossing; and that it would enable them to reach the Elkins Milling Company at First street and Railroad avenue, as well as pass by the roundhouse and machine shops of the Western Maryland Railroad Company, reaching their line again at Read street and Harrison avenue, thus giving them equally as good, if not better, route for passenger traffic and eliminate the dangers, obstructions, inconveniences, and responsibilities of a grade crossing, and put the electric railway company in just as good position to exchange passengers and freight with the railroad company. Bloomfield disagrees with this, and reports that he agrees that there is a place on First street where a crossing could be made under the Western Maryland Railroad Company's track, but that it is not practicable for the

operation of the electric railway from the fact that the electric railway company would be compelled to make a cut at First street under the Western Maryland Railroad Company's bridge to a depth of 7½ feet to give them clearance of 18 feet, which is necessary for the operation of their railway, and would place them 7 feet under water from three to six times a year and 12.1 feet under water in case of flood like that of July, 1907; that, to overcome this, the electric railway company would have to build a retaining wall for a distance of 400 feet in order to keep the water out; that an approximate cost of this undergrade crossing to the electric railway company at First street would be, for the concrete wall $600, for the excavation $500, or a total of $1,100; that they would be to the cost of building track from Third street down Davis avenue to First street, then along First street to Porter avenue, thence along Porter avenue to Main street, then along Main street to Read street, then along Read street to Harrison avenue where they would have connection with their present track, a distance of about 4,000 feet, and that this cost of construction would approximate $12,500, including the undergrade crossing on First street under the Western Maryland Railroad Company's track: that a great disadvantage, and great expense would be incurred in the operation of the line under the Western Maryland Railroad Company's bridge on First street from the fact that there would be five extra 90-degree curves requiring extra power to operate the cars around them and extra expense of maintenance of the same, and by reason of the heavy grades they would have over that route. Lemley reports alone that an undergrade crossing could be established at the point asked for by the electric railway company, but that it would be at a very great expense, which expense he could not estimate without a survey and test made to show the material through which it would be necessary to make the required excavations. He further reports that an overhead crossing of the Western Maryland Railroad Company's tracks could be made at a large cut 350 to 400 feet east of the point where the grade crossing is asked for, but that he has no survey and no estimate of damages that would have to be paid to the owners of lands adjacent to the Western Maryland Railroad Company's right of way, nor has he any information whether the city would allow any change in the grades in the streets necessary to reach this crossing. A number of depositions of witnesses were taken and the cause submitted for hearing.

W. B. Maxwell, for petitioner, the Elkins Electric Ry. Co.

Benjamin A. Richmond and E. A. Bowers, for receiver and the Western Maryland R. Co.

DAYTON, District Judge (after stating the facts as above). The right determination of the questions involved in this controversy depends upon the construction of certain West Virginia statutes. At the threshold it may be best to set forth these statutory provisions:

Section 2343, Code 1906 (chapter 54, § 50), defines additional powers conferred by the act upon railroad corporations in 12 separate clauses of which I quote:

"Second. To take and hold such voluntary grants of real estate and other property as shall be made to it, in aid of the construction and use of its railroad, and to sell and convey the same, when no longer required for the uses of such railroad, not incompatible with the terms of the original grant.

"Third. To purchase, hold and use all such real estate and other property as may be necessary for the construction and use of its railroad, and the stations and accommodations necessary to accomplish the object of its incorporation, and to sell and convey the same when no longer required for the use of such railroad.

"Sixth. To construct its railroad across, along or upon any stream of water, water-course, street, highway, road, turnpike or canal which the route of such railroad shall intersect or touch; but such corporation shall restore the stream, water-course, street, highway, road, turnpike thus intersected or touched to its former state, or to such state as not unnecessarily to have impaired its usefulness, and to keep such crossing in repair. * * * And provided further, that in case of the construction of said railroad along highways, roads, turn-

pikes or canals such railroads shall either first obtain the consent of the lawful authorities having control or jurisdiction of the same, or condemn the same under the provisions of section forty-eight of this chapter.

"Seventh. To cross at grade, or to cross over or under, intersect, join and unite its railroad with any other railroad now built and constructed, or hereafter to be built and constructed within this state, at any point on its route, and upon the grounds of such other railroad company, with the necessary turnouts, sidings and switches, and other conveniences in furtherance of the object of its connections, and every corporation whose railroad is, or shall be hereafter intersected by any new railroad, shall unite with the corporation owning such new railroad in forming such intersection and connections and grant the facilities aforesaid; and if the two corporations cannot agree upon the amount of compensation to be made therefor, or the points and manner of such crossing and connections, the same shall be ascertained and determined in the manner prescribed by section forty-eight of this chapter."

The section 48 (section 2340) referred to in the two last clauses provides:

"Sec. 48. If any railroad corporation shall be unable to agree with the owner of any real estate for the purchase thereof for its corporate purposes it may have such real estate condemned for such purposes under the provisions of chapter forty-two of the Code. * * * Any such corporation may take and hold under any grant or ordinance made by a municipal corporation any interest or right such municipal corporation may have in any street, alley or public ground, and may exchange therefor, in whole or in part, dedicate or otherwise secure to public use, another street, alley or parcel of ground out of real estate owned by such railroad corporation, whether acquired by purchase or condemnation; or under an agreement with such municipal corporation, may condemn land for use as such new street, alley or public ground, in the same manner as it may condemn land for its own use. * * *"

The chapter 42 of the Code referred to above defines the public use for which private property may be taken, and provides the methods of procedure in so taking it.

The Legislature of Virginia at its session of 1836–37 (Acts 1836–37, p. 108, c. 118, § 16) passed an act which became incorporated into as section 24 of chapter 56 of the Code, 1849, which provided that:

"Sec. 24. If any railroad, turnpike or canal company deem it necessary in the construction of their work to cross any other railroad, turnpike or canal, or any state or county road, it may do so, provided its work be so constructed as not to impede the passage or transportation of persons or property along the same. If any such company desire that the course of any other railroad, turnpike, canal or state road should be altered to avoid the necessity of any crossing, or of frequent crossings, or to facilitate the crossing thereof, the alteration may be made in such manner as may be agreed between the company desiring such alteration and the other railroad, turnpike or canal company, or the board of public works in the case of the state road. And if such construction or alteration as is allowed by this section, shall cause damage to any company, or to the owner of any lands, the railroad, turnpike or canal company first mentioned, shall pay such damage. But any county road may be altered by such company for the purpose aforesaid, whenever it shall have made an equally convenient road in lieu thereof."

This provision was incorporated without change in Code Va. 1860, c. 56, § 24, and in the Code W. Va. 1868, c. 52, § 11. The Legislature of West Virginia incorporated into an act of April 3, 1873 (Acts 1873, p. 213, c. 88), the law of the state governing the organization, powers, management, and operation of railroads, and in this act incorporated what is now substantially section 2343 (chapter 54, § 50) of our Code of 1906, portions of which have been hereinbefore cited. By the act of March 10, 1881 (Acts 1881, p. 212, c. 16), this section

11 of chapter 52 of the Code was amended so as to provide that, in case the parties interested fail to agree upon such crossing or alteration as is desired, the company desiring it may bring its suit in equity, etc., and with this amendment it became incorporated into our Code of 1906 as section 2216 (chapter 52, § 11). And by an act passed February 19, 1907 (Acts 1907, p. 228, c. 43), this section was still further amended so as to make it applicable to pipe line companies. As it now stands it reads as follows:

"Sec. 11. If any railroad, turnpike, or canal company, or any company organized for the purpose of transporting carbon oil or natural gas, or both, by means of pipes or otherwise, deem it necessary in the construction of its work, or any branch or siding thereof, to cross any other railroad, turnpike, or canal, or pipe line, or any state or county road at grade or otherwise, it may do so; provided, its work be so constructed as not to impede the passage or transportation of persons or property along the same. If any such company desire that the course of any other railroad, turnpike, canal, pipe line, or stateroad, or any stream which is not a public highway, should be altered to avoid the necessity of any crossing, or of frequent crossings, or to facilitate the crossing thereof, or the construction of a parallel work, the alteration may be made in such manner as may be agreed between the company desiring such alteration and the other railroad, turnpike, or canal company, or pipe line company, or the board of public works in the case of a state road, or the owners of the land to be affected by the alteration of the course of such stream. In case the parties interested fail to agree upon such crossing or alteration as is desired, the company desiring it may bring its suit in equity, and in such suit the court may, in a proper case, decree that such, or any proper crossing, or alteration, may be made upon payment of damages to be ascertained as provided in chapter forty-two of the Code, and the company desiring such crossing or alteration may thereupon proceed under said chapter to obtain the right to make such crossing or alteration. If such crossing or alterations as is allowed by this section, shall cause damage to any company, or to the owner of any lands, the railroad, turnpike, canal, or pipe line company first mentioned shall pay such damages; but any county road may be altered by any such company for the purpose aforesaid, whenever it shall have made an equally convenient road in lieu thereof."

## Section 2358 (chapter 54, § 61) provides:

"Sec. 61. A bell or steam whistle shall be placed on each locomotive engine, which shall be rung or whistled by the engineer or fireman, at the distance of at least sixty rods from the place where the railroad crosses any public street or highway, and be kept ringing or whistling for a time sufficient to give due notice of the approach of such train before such street or highway is reached, under a penalty of not exceeding one hundred dollars for each neglect, one-half of which shall go to the State and the other to the prosecuting witness; and the corporation owning or operating the railroad shall be liable to any party injured for all damages sustained by reason of such neglect. Provided, that such penalty shall be sued for within three months from the time the cause of action arises, and not after. When the tracks of two railroads cross each other, or in any way connect at a common grade, the crossing shall be made and kept in repair, and watchmen maintained thereat at the joint expense of the companies owning the tracks; all trains or engines passing over such tracks shall come to a full stop not nearer than two hundred feet nor farther than eight hundred feet from the crossing and shall not cross until signaled so to do by the watchman, nor until the way is clear; and when two passenger or freight trains approach the crossing at the same time, the train on the road first built shall have precedence, if the tracks are both main tracks over which all passengers and freights on the road are transported; but if only one track is such main track, and the other is a side or depot track, the train on the main track shall have precedence; and if one of the trains is a passenger train and the other a freight train, the former shall take precedence; and regular trains on time shall take precedence over trains of the same grade not on time, and

engines with cars attached not on time shall take precedence of engines without cars, not on time."

It is, in effect, earnestly insisted in this case by counsel that the electric railway company has the right under clause seven of section 2343 (chapter 54, § 50) of the Code "to cross at grade" the tracks of the Western Maryland Railroad Company "at any point on its route" and upon the grounds of the defendant railroad company that it may select, and that this section of the law imposes upon the defendant railroad company the obligation to "unite with it in forming such intersection and to grant it facilities for the purpose," and that by the terms of section 2358 (chapter 54, § 61) it is entitled to require the defendant railroad company to bear half the expense of the making and keeping in repair of such crossing, as well as the cost of maintaining a watchman thereat.

On the other hand, it is insisted by the defendant railroad company's counsel that under section 2216 (chapter 52, § 11) of the Code the electric company is not entitled to select its place of crossing, but that in case of disagreement it is required to apply to a court of equity, and have that court of equity pass upon and determine where such crossing should be, its character, and the conditions and limitations under which it should be made, and then must resort to the court of law in the usual condemnation proceeding to have ascertained the damages that it should pay to the defendant company for such crossing. It seems clear, both by the terms of the statute and by the decisions in this state, that the right of way of a railroad becomes the private property of such company, and that the rights of the public therein extend only to the use made thereof. The statutes quoted expressly give to such company the right, by gift or purchase, to take in fee such right of way and other real estate as may be necessary for its purposes. When it has acquired such real estate and no longer needs the same for its purposes, it may by these statutes exchange or sell the same. In Railroad Company v. Ironworks, 31 W. Va. 710, 8 S. E. 453, it is held:

"The property of railroad corporations, so far as concerns the ownership thereof and the profit to be made of its uses, is to all intents and purposes private property, although applied to a use in which the public have an interest."

By reason of the interest which the public has in the use of such railroad property the Legislature has allowed the right of condemnation to be exercised in behalf of railroad corporations to secure such right of way. It must be conceded that, where one railroad company has secured under its charter rights the right of way and built thereon its line of road and is using the same for public uses, the Legislature could not authorize the taking wholly thereof by another railroad corporation for a like public use. The extent of its power would be to authorize the second company to place upon the land an additional burden or easement on or over it to be constructed so as "not to impede transportation of persons or property along the same" by the first corporation owning the fee title to the land. These fundamental principles were well set forth and settled by Tucker, J., in Tuckahoe Canal Company v. Tuckahoe & James River Railroad Co., 11 Leigh (Va.) 42, 36 Am. Dec. 374. Where railroads cross each other for the

mutual benefit of both, and do "not impede the transportation of persons and property along the" route of the first one owning and operating the right of way, the Legislature may well direct as it has in clause 7, § 2343 (chapter 54, § 50), that the railroad intersected "shall unite with the corporation owning such new railroad in forming such intersection," but this section cannot be construed as, first, authorizing the new company to take wholly the property of the old to the destruction of its right to use and operate its road; nor, second, to take such right of easement and joint use without paying just compensation. Such a construction of this statute would be to allow confiscation and destruction of vested rights in the older company which are always to be first considered. It is unfortunate that there should be such apparent conflict between clause 7 of section 2343 (chapter 54, § 50) and section 2216 (chapter 52, § 11), and it is also unfortunate that so few decisions of the Supreme Court of Appeals of this state exist construing and harmonizing them. In fact, there exist but two such decisions, and, while rendered within less than four months of each other, most unfortunate of all they are in several particulars in direct conflict with each other and muddy rather than clear the waters. These two cases found in the same volume are Wellsburg & State Line R. R. Co. v. Panhandle Traction Co., 56 W. Va. 18, 48 S. E. 746; Grafton & Belington R. R. Co. v. Buckhannon & Northern R. R. Co., 56 W. Va. 458, 49 S. E. 532. In the first case Poffenbarger, J., very fully, clearly, and, I think, satisfactorily, lays down the true principles to guide us in cases like this arising under these statutes. He very pertinently calls attention to the fact, as I have done, that section 2216 (chapter 52, § 11) has come down to us from the Virginia legislation of 1837, and has been re-enacted and incorporated in all the Codes since that date. I have shown, a fact arising since this decision was rendered, that it was re-enacted and extended to pipe line companies by the Legislature of 1907. He sets forth substantially: (a) That the acquisition of a crossing by one railroad over another involves a taking of private property for public use. (b) That by this section 2216 courts of equity have power to determine (1) the exact location of such crossing; (2) the manner in which it shall be made. (c) That wherever such crossing at grade is necessary it is to be granted, in the absence of agreement by the parties, under such conditions and limitations as to location and mode of crossing as such courts of equity may justly impose, in view of the interests of the parties and those of the public. (d) That, while courts of equity thus have the right to determine the location and mode of crossing, they do not have the right to grant or decree the crossing itself to be made or the right to make it, or to ascertain and fix the damages to be paid for it, but that this must be done by the law court by condemnation proceeding under chapter 42 of the Code.

The opinion in the second case is both brief and unsatisfactory, and, with the utmost deference, in my judgment, unsound. In that case one railroad company had instituted at law its proceeding against another railroad company to condemn a crossing of its own location and mode of construction, and not agreed to by the owning company. The latter brought its bill in equity to enjoin such proceeding at law until the court of equity could determine the location of such crossing and

the conditions and limitations under which it should be made. The court held that the law court had jurisdiction to condemn the crossing, and that equity had no jurisdiction to restrain or stay such proceeding at law. This conclusion is sought to be sustained on the ground that:

"It is a well-settled rule that a court of equity will not usually enjoin an action at law on grounds which may be urged as a defense to such action. Even in cases of concurrent jurisdiction the action will not be interfered with by a court of equity, unless that court can give a more perfect remedy or the case can be better tried by the procedure of that court."

That this principle is an A B C one in common-law practice will not be questioned. But in the enforcement of purely statutory requirements wherein each court has a defined duty to perform, and that of the equity court to be performed first by the inevitable necessities of the case, how does such principle apply? It cannot for a moment be held that the two courts have "concurrent" jurisdiction over the whole matter involved. It is the exclusive right of the equity court to fix the location of the crossing, and to set forth the conditions and limitations upon which it can be made at this location. It is then the exclusive right of the law court to enforce the law of eminent domain, and condemn and take the property right to this easement, and fix and ascertain the compensation to be paid therefor. Until the equity court has fixed the place of crossing and its character, how can the law court ascertain the damages to be paid for its taking? How can petitioner in such condemnation proceeding undertake to describe the crossing he is entitled to have? How can any jury determine the damage for something not identified and not known? How could a writ of error in such proceeding help the matter? Reverse and dismiss the proceeding it may be answered. Would this be better than to stay it until identity and location can be determined? What possible ground for prohibition would exist? Prohibition is allowable to prohibit a proceeding wholly unwarranted by law, or one assumed to be taken by a court absolutely without jurisdiction. The petitioner here had right to enforce a crossing, and the law court had complete jurisdiction, but only after the equity court had determined its location, conditions, and limitations. It is to be noted that while Poffenbarger, J., who wrote the opinion in the first case, concurs in this one by McWhorter, J., that injunction will not lie, he decidedly objects to its logical conclusion that, under the seventh clause of section 2343 (chapter 54, § 50), the company desiring the crossing can go on and fix its location and character, then go into the law court, and have it condemned where and as it wants it as a matter of right, regardless wholly of the rights of the company owning, in possession of, and using the land.

For my part, in view of the conflict in these two decisions by the same court and the same judges, these two being the only ones, I feel free as a federal judge under well-settled principles laid down by the Supreme Court to guide me in such cases to wholly reject the principles laid down in this case of Grafton & Belington R. R. Co. v. Buckhannon & Northern R. R. Co., and hold in accordance with those of the Railroad Co. v. Traction Co. that the right to condemn at law a crossing as provided by clause 7 of section 2343 is inchoate, and cannot in case of disagreement of parties be enforced until the location and char-

acter of such crossing has been first determined by the equity court under the provisions of section 2216. If necessary, I would hold that, if such condemnation were attempted, the equity court would have full power to enjoin and stay the prosecution of any such proceeding at law until it had by its decree fixed the location and character of the crossing to be condemned. I have deemed this discussion necessary in order to determine the contention of the electric company that it is entitled to have the crossing of its choice as a matter of right. As to the contention that under this same clause 7 of section 2343 that provides that "every corporation whose railroad is, or shall be hereafter intersected by any new railroad, shall unite with the corporation owning such new railroad in forming such intersection and connections and grant the facilities aforesaid," and section 2358 (chapter 54, § 61), which provides, among other things, that "when the tracks of two railroads cross each other, or in any way connect at a common grade, the crossing shall be made and kept in repair, and watchmen maintained thereat at the joint expense of the companies owning the tracks," the railroad company is not entitled to damages for the crossing, it is sufficient to say, in addition to what I have already said, that these statutes confused and conflicting as they seem to be do not in my judgment uphold such contention. If they did, when it is remembered that the taking of such crossing, as we have shown, is "a taking of private property," then they would have to be held to be in contravention of the constitutional provision inhibiting "the taking of private property without just compensation therefor," and therefore void. I have grave doubt whether section 2358 was ever designed to or can be construed to apply to crossings made by electric railroads. Taking all its provisions together, requiring the sounding of whistles or the ringing of a bell required to be maintained by the engines, etc., it would seem to be applicable alone to steam roads. If it is applicable, it seems to me clear that, in ascertaining the damage to be recovered by the railroad, account must be taken of the one-half cost of maintenance and repair and of watchmen imposed by this statute, but I am not required to determine this finally at this time. If, then, this court must determine, as such seems to be the requirement of the law, the location of a crossing over defendant's tracks for this electric road, I feel constrained to say from the report of the engineers and the evidence in the case that such crossing should not be fixed or allowed at the point asked for by the electric company. Without discussing the evidence, it clearly shows that such crossing would be very dangerous to the railroad and to the public; that it would be very expensive to both roads, would very greatly impede the railroad company's necessary operations, and can be avoided. So far as crossing at First street is concerned, I think it practicable, but undesirable, far better than the one sought, however. As it is tendered free without conditions, it would require no further investigation on the part of this court to fix its character. My deliberate judgment would favor the overhead crossing some 300 or 350 feet beyond the one asked for by petitioner, and, if it is desired by the petitioner to investigate this one further, I will retain the cause for a reasonable time to enable them to do so, or, if desired, I will require report thereon to be made by engineers.